**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOANN AND PAUL GAVRITY,**
**parents of a disabled student, M.G.,**

                **Plaintiffs,**

      **vs.**                                        **1:05-CV-1024 (Lead Case)**
                                                  **1:06-CV-317 (Member Case)**
**NEW LEBANON CENTRAL SCHOOL**                    **(NAM/DRH)**
**DISTRICT and PATRICK GABRIEL,**
**in his individual and official capacity**
**as superintendent,**

                **Defendants.**
_____

**APPEARANCES:**                                 **OF COUNSEL:**

Family Advocates, Inc.                            Rosalee Charpentier, Esq.
209 Clinton Avenue
Kingston, New York 12401
*Attorney for Plaintiffs*

Girvin & Ferlazzo, P.C.                           Karen S. Norlander, Esq.
20 Corporate Woods Boulevard
Albany, New York 12211
*Attorney for Defendants*

**NORMAN A. MORDUE, Chief U.S. District Judge**

**MEMORANDUM DECISION AND ORDER**

## I.      INTRODUCTION

      Plaintiffs Joann and Paul Gavrity, parents of M.G., a student with a disability, bring this

action against defendants New Lebanon Central School District ("the District") and

Superintendent Patrick Gabriel under the Individuals with Disabilities in Education Act, 20

U.S.C. § 1401-1482 ("IDEA"), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132,

the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796l, and 42 U.S.C. § 1983, alleging a violation

of the Equal Protection Clause of the United States Constitution.

In their first causes of action,[1] plaintiffs allege that the individualized education plans ("IEPs") the District formulated for M.G.'s fifth (2003-2004) and sixth (2004-2005) grade years failed to offer a "free appropriate public education", in violation of the IDEA.[2]  Plaintiffs seek reimbursement for the tuition and costs associated with their unilateral placement of M.G. at The Kildonan School, a private school for dyslexic students, for his fifth and sixth grade years.

In their second causes of action, plaintiffs allege that under New York State Education Law § 4402(4)(d), defendants were required, but refused, to provide M.G. with transportation to Kildonan.  Plaintiffs contend defendants' denials of their transportation requests for both school years were discriminatory and in retaliation for their commencement of administrative proceedings to challenge the IEPs, in violation of the ADA, the Rehabilitation Act, and the Equal Protection Clause of the Constitution.

Prior to filing the instant actions, plaintiffs commenced separate administrative proceedings before Impartial Hearing Officers ("IHOs") challenging the 2003-2004 IEP and 2004-2005 IEP.  In the first proceeding, plaintiffs claimed the 2003-2004 IEP was defective procedurally and substantively under the IDEA, and sought reimbursement for the tuition and

---

[1]The Court previously granted defendants' motion pursuant to Rule 42(a) of the Federal Rules of Civil Procedure to consolidate plaintiffs' two separate actions pertaining to the 2003-04 and 2004-05 school years, respectively.  *See* Dkt. 13, Order 1:06-CV-317.  Civil Action 1:05-CV-1024 is designated as the "lead case" while civil action 1:06-CV-317 is designated as the "member case."

[2]Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A); *see also Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006).  To that end, the IDEA guarantees that a child with a disability receives a free appropriate public education from as early as age three until age twenty-one.  *See* 20 U.S.C. § 1412(a)(1)(A) (providing IDEA funding to states to ensure that eligible children receive a free appropriate public education).  A free appropriate public education "must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits."  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.2d 119, 122 (2d Cir. 1998).

2

transportation costs associated with their placement of M.G. at Kildonan for the 2003-2004 school year.  The IHO conducted a hearing and issued a decision finding that the 2003-2004 IEP the District's Committee on Special Education ("CSE") formed for M.G. offered a free appropriate public education and denying plaintiffs' claim for reimbursement.  Plaintiffs appealed and a State Review Officer ("SRO") affirmed.  Action 1:05-CV-1024 followed.

Plaintiffs initiated a second administrative proceeding to obtain reimbursement for tuition and transportation costs associated with their placement of M.G. at Kildonan for the 2004-2005 school year.  Plaintiffs claimed procedural and substantive violations of the IDEA in connection with M.G.'s 2004-2005 IEP.  After a hearing, the IHO denied plaintiffs' claim.  Plaintiffs appealed and an SRO affirmed.  Action 1:06-CV-317 followed.

Presently before the Court are plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment.

## III.    ADMINISTRATIVE RECORD  2003-2004 SCHOOL YEAR [3]

The administrative record formed as a result of plaintiffs' request for a hearing regarding their entitlement to reimbursement for M.G.'s Kildonan tuition and transportation costs for the 2003-2004 school year consists of numerous documents, more than 1,300 pages of hearing testimony before an impartial hearing officer ("IHO"), and decisions by the IHO and SRO.  The record, in relevant part, is summarized below.

### A.    Facts

M.G. was born on February 2, 1993.  T. 683.  M.G.'s father, Mr. Gavrity testified that M.G.'s hearing was tested when he was three or four because he "[d]idn't seem to be talking

---

[3]All citations in this section are to the hearing transcript and exhibits from the Administrative Record for the 2003-2004 school year unless otherwise noted.

well" but that otherwise M.G. was "within developmental guidelines."  Transcript of Hearing on 2003-2004 IEP, p. 684 ("T. 684").  Mr. Gavrity stated that M.G. attended preschool for one year before entering kindergarten, and although "his speech was somewhat difficult to understand" and "he struggled with words", he seemed "relatively normal . . . at that point."  T. 685.

Mr. Gavrity testified that M.G. did well socially in kindergarten.  *Id.*  Mr. Gavrity stated that when, at the end of M.G.'s kindergarten year, plaintiffs told the elementary school principal that M.G. could not identify letters, "people started noticing that something was wrong."  T. 685-86.

### 1.    1999-2000 First Grade

Mr. Gavrity testified that when M.G.'s teacher screened him at the beginning of first grade and found he could not identify letters, she immediately requested services for him and referred him to the District's child study team.  T. 686-87.  In November 1999, the child study team recommended that M.G. undergo a speech language evaluation.  T. 688.  In February 2000 an IEP was formalized classifying M.G. as "speech/hearing impaired" and recommending that M.G. receive language training, reading training, and speech services.  T. 688-89, 692.  According to Mr. Gavrity, test results indicated that by the end of first grade M.G. was reading at the grade equivalent of kindergarten, seven months.  T. 691.

### 2.    2000-2001 Second Grade

Mr. Gavrity stated that although M.G. received reading services in second grade, he did not progress and his reading was poor.  T. 697.  Mr. Gavrity testified that the "aide time in the classroom was inconsistent" and that the speech services provided "did not seem to be the ones needed for him to proceed."  *Id.*  Mr. Gavrity testified that at the end of second grade M.G.'s

4

Wechsler Individual Achievement Test ("WIAT") indicated that he was reading at the grade equivalent of first grade, nine months, or 1.9.  T. 698-99, P. Ex. E.

On May 4, 2001, the CSE met to plan for M.G.'s third grade year.  T. 700.  On May 15, 2001, M.G. underwent an occupational therapy evaluation by Judith Hamm.  D. Ex. 13.  Hamm reported that testing "indicated difficulties with figure ground discrimination" which could have "academic implications in reading and written work."  *Id*.  Hamm recommended "a home listening program that improves auditory and visual processing skills" as well as "organizational skills."  *Id*.

In a social history dated August 16, 2001, J. Richard Morgan, school social worker, reported that M.G. had no problems relating to and playing with peers, enjoyed playing sports, and had no problematic behavior areas.  D. Ex. 15.  Morgan stated, however, that M.G. had difficulty with speech development and "alphabet and language based skills."  *Id*.

On August 28, 2001, M.G. underwent an audiological evaluation by Alice Bassen, MA, CCC-A.  D. Ex. 14.  Bassen reported that the results suggested M.G. was "having some temporal processing problems,[4] some questionably auditory closure problems,[5] some binaural separation and integration problems,[6] possible problems with interhemispheric transfer of information and

---

[4]"Temporal processing problems refers to M.G.'s ability to recognize acoustic contours.  The auditory processes that contribute to this ability include discrimination subtle differences in auditory stimuli, sequencing of auditory stimuli, gestalt patter perception and trace memory. "  D. Ex. 14.

[5]"Auditory closure or decoding problems refers to M.G.'s ability to use intrinsic and extrinsic redundancy to fill in missing or distorted portions of the auditory signal to recognize a whole message.  This could lead to difficulties with phonics, articulation, reading."  D. Ex. 14.

[6]"Binaural separation integration manifests itself in behavioral symptoms of difficulty hearing in background noise or when more than one person is talking.  This is critical for everyday listening situations, especially in school."  D. Ex. 14.

selective auditory attention problems."[7]  *Id*.  Based on the testing results, Bassen recommended that M.G. receive preferential classroom seating "away from noise" and "temporal pattern training".  *Id*.  Bassen also recommended "auditory closure activities", "selective auditory attention management", building M.G.'s organizational skills, providing directions to M.G. "in small increments", and an "at home program to help [M.G.] listen in background noise".  *Id*.

### 3.    2001-2002 Third Grade

In third grade, M.G. received pull-out reading services and consulting time in the classroom as needed.  T. 703.  Mr. Gavrity testified that the CSE met on September 14, 2001, to review M.G.'s  visual[8] and audiological evaluations.  *Id*.  As a result of that meeting, the District obtained a "FM device" for M.G. to counteract distractions coming from noise in the classroom.  T. 705-06.  According to Mr. Gavrity, however, M.G. had to share it with another student and the teachers did not use it because they found it "difficult" and "didn't like it".  T. 706.

Amy Brandoline, M.G.'s third grade reading teacher, assessed his skills in March 2002 and reported that she:

> would place [M.G.] at an end of first grade-beginning of second grade reading level. Even though he was able to complete tasks at the mid-second grade level, most of the work was slow and laborious for him.  His fluency and word recognition skills are not automatic and are lacking in consistency.

---

[7]"Interhemispheric transfer problems may manifest themselves when a report of more than two critical elements is necessary."  D. Ex. 14.

[8]Robert Fox, O.D., F.C.O.V.D., of Fox Vision Development Center, saw M.G. on August 14, 2001 and diagnosed him "with vision skills deficits that were affecting his visual comfort and also having a negative affect on his classroom performance."  D. Ex. 12.  Following the vision evaluation, M.G. began receiving weekly vision therapy services.  T. 701.
According to progress notes dated March 15, 2002, Dr. Fox stated that M.G. "recently completed an office based program of optometric vision therapy".  D. Ex. 12.  "Deficits in eye focusing, tracking, and eye coordination were causing eye fatigue and affecting school performance."  D. Ex. 12.  According to Dr. Fox, M.G. "made very good progress" but has reached "a plateau at this time."  D. Ex. 12.  Dr. Fox prescribed "home-based vision therapy activities" and believed that M.G. "will continue to need remediation in reading, but his rate of progress should be better with his improved vision skills."  D. Ex. 12.

D. Ex. 10.

Mr. Gavrity testified that M.G. was struggling emotionally at the end of third grade, T. 713, and test results indicated that he was reading at the 2.9 grade level.  P. Ex. E, T. 716.

On June 20, 2002, the CSE met to conduct an annual review of M.G.'s progress and formulate an IEP for fourth grade.  P. Ex. F.  Mullen stated that during this meeting plaintiffs indicated that M.G. had not progressed "to their satisfaction."  T. 174.  In response, Mullen suggested an outside evaluation.  *Id*.  According to Mullen, plaintiffs agreed and M.G.'s mother recommended that Barbara Read conduct the evaluation.  *Id*.  The CSE arranged for this evaluation to commence on September 18, 2002.  *Id*.

### 4.      Summer 2002 Camp Dunnaback

During the summer of 2002, plaintiffs sent M.G. to Camp Dunnaback at Kildonan for six weeks.[9]  At Dunnaback, M.G. took the Wide Range Achievement Test - Third Edition (WRAT-3), the Gray Oral Reading Test ("GORT-4"), and the Gates-MacGinitie Silent Reading Test in June 2002, and again in August 2002.  P. Ex. H.  The documents containing M.G.'s test scores state that they "were obtained under optimum conditions" and warn that "[c]aution should be exercised in interpreting test results.  It must, for instance, be remembered that the final testing was done under optimum conditions at the end of a period of intensive study."  *Id*.  While at Dunnaback, M.G.'s scores in reading skills on the WRAT-3 improved from a school grade equivalent of 3.2 to 4.3.  *Id*.  M.G.'s scores in reading rate and accuracy on the GORT-4 showed improvement from a grade equivalent of less than 1.0 in both areas to 1.2 in rate and 1.7 in

---

[9]Dunnaback is a summer "academic camp" which provides "one-to-one" tutoring daily; "campers complete assignments in a variety of study halls scheduled throughout the day . . . .  Campers return to their schools in the fall with more confidence and better reading and writing skills."  P. Ex. G.

accuracy.  *Id*.  M.G.'s scores on the GORT-4 in reading fluency stayed at less than 1.0.  *Id*.

M.G.'s scores on the Gates MacGinitie test improved from 1.6 to 2.7 in reading vocabulary, and

from 2.1 to 3.3 in reading comprehension.  *Id*.  M.G.'s scores in spelling skills on the WRAT-3

improved from 2.2 to 2.9.  *Id*.

According to a document dated August 10, 2002 by Ula Zolet from Dunnabeck, M.G.:

adjusted well to tutoring, becoming more self-confident and interested in his work as the summer proceeded.  He arrived to class on time and in good humor.  He had difficulty focusing during study hall although with the help of a proctor he completed his assignments . . . .

[M.G.] is familiar with the basic elements of phonics but needs continued practice applying them when reading unfamiliar words . . . .

Spelling is a challenge . . . he has difficulty working within the Simultaneous Oral Spelling method.  He needs to sound out all the phonemes in order to be successful when spelling . . . .

[M.G.] enjoys to write [sic] creatively, but finds it difficult to transfer his thoughts onto paper.  He can write basic paragraphs but found writing expanded paragraphs overwhelming.    He worked on sentence structure including capitalization, punctuation, and syntax.  He enjoys letter writing, however, as it is not so structured as expository writing . . . .

[M.G.] enjoys reading although he struggles to express verbally what he comprehends. . . . .

[M.G.] completed a large amount of work this summer and should return to school in the fall with a greater level of confidence . . . .

*Id*.

According to Dunnabeck's recommendations:

[M.G.] should continue to receive remedial instruction by a trained Orton-Gillingham tutor.  The Orton-Gillingham Approach follows a systematic and sequential introduction of sound-symbol relationships and promotes greater phonological awareness.  These language concepts are taught using multi-sensory techniques in order to strengthen visual and auditory memory for language.  He has benefitted from one-on-one supportive tutoring using this approach.

8

[M.G.] should continue using the cursive writing skills that have been established over the summer.  He should continue to use cursive in all his written work.  Under no circumstances should he be permitted to revert to printing.  Consistent, legible cursive writing is the key kinesthetic element of the Orton-Gillingham Approach and necessary for reinforcing reading and spelling concepts and communicating knowledge.

A daily period should be set aside for practice reading aloud.

Before [M.G.] starts to write, either by hand or on the computer, he should create a scratch outline, web, or map . . . .

[M.G.] may need a quiet, distraction-free environment in which to take tests.

We recommend that a specific time and quiet place be set aside each day for completing homework and that [M.G.] might benefit from a homework tutor.

P. Ex. H.

### 5.    2002-2003 Fourth Grade

On August 29, 2002 and September 18, 2002, M.G. underwent a psycho-educational evaluation by Read.  D. Ex. 11.  Read found that M.G.'s "current evaluation shows cognitive and academic profiles that are consistent with phonological dyslexia" and that he likely had "multiple deficits in the essential psycho-linguistic abilities necessary for the development of reading and writing skills.  Specifically [M.G.] demonstrates significant difficulties with phonemic awareness and manipulation, short-term and working memory, cognitive speed/fluency, on-demand associative recall and rapid naming."  *Id*.  Read further indicated that despite the "instructional energy":

focused on [M.G.'s] educational program over the past few years . . . . there appears to be a persistence of concerns about [M.G.'s] rate of progress in essential reading and writing skills. [M.G.'s] parents are worried (not unjustifiably) about what they perceive as a growing gap between [M.G.'s] independent competence in literary skills vs. the increasing demands of the regular curriculum.

D. Ex. 11.  Read concluded that "in light of his current cognitive and academic profiles" M.G.'s

9

"educational program needs to undergo a qualitative shift in structure and methodology." *Id.*

Read made extensive recommendations regarding reading, written language, and mathematics and set forth "general instructional considerations". *Id.* Specifically, Read recommended that M.G.'s reading instruction be "carefully structured and 'code-emphasis' in nature" and that any program "should be multisensory in design - - based upon the principles of Orton-Gillingham - - with input coupled with visual and auditory modalities." *Id.* In her report, Read identified materials she believed would help M.G. improve his reading and writing, including the "Language!" program, which, she explained, would "ensure the integration of [M.G.'s] phonological and linguistic foundation . . . into the basic skills for reading and writing, and then through to comprehension and written expression." *Id.* Read also recommended "Speed Drills for Decoding Automaticity", "Making Words", the "Glass Analysis Decoding" program, "The Phonological Awareness Profile", and "Magnetic Poetry or Magnetic Poetry for Kids". *Id.*

On October 25, 2002, the CSE convened to incorporate the recommendations from Read's report into M.G.'s 2002-2003 IEP. T. 178, D. Ex. 9. Read participated in the CSE meeting via telephone. T. 726. Young testified that the CSE "went over [Read's] suggestions and evaluations and we did talk about the fact that since we would be using a Language curriculum, which at that point we were just beginning, that we probably would need fluency goals and objectives." T. 100-01. Young stated that the CSE set goals and objectives for comprehension, fluency, and phonemic awareness.[10] T. 45.

Young testified that no one at the meeting disagreed with Read's findings or recommendations and that M.G.'s mother "was strongly recommending [the Language!

─────────────────

[10]According to Young, phonemic awareness "is helping students develop a sound . . . their ability to manipulate the sounds in words using letters, rhyming, syllabication, breaking it apart in syllables." T. 46.

program]".  T. 39, 41.  Mr. Gavrity testified that although Read recommended approximately fifteen programs for M.G., the District only purchased and utilized the Language! program.  T. 871-72.  Mr. Gavrity stated that none of the recommendations in the audiological evaluations were implemented to help M.G.'s auditory processing.  T. 728.

Young testified that the District purchased the Language! program and she used its curriculum with M.G. from that point forward.  T. 41-42.  Young stated that although she had no classroom hours or credentials in any Orton-Gillingham program, she was trained in the Language! program and had used the multi-sensory reading approach in the prior language arts classes.  T. 95, 96.[11]  Young explained that the Language! curriculum was a "systematic sequential program.  It is based on mastery.  It teaches phonemic awareness, writing, reading using word programs.  It is diagnostic in that you can see what a student needs and help him develop in those areas."  T. 42.  Young stated that it was a "multi-sensory program in that all the senses are used.  Spelling connects to reading . . . . The phonemic awareness has some hand signals that are used to sweep the words."  T. 43.  Young stated that the Language! curriculum was comprehensive and included lesson plans.  T. 97.  Young testified that they "had daily fluency drills, both phonetic and non-phonetic in each unit" as well as "timed readings and . . . phonemic awareness drills each day for 10 to 15 minutes."  T. 46.  Young explained that in the Language! program, "whatever the mastery skill was that you were working on that to move on, you would have to meet that 85 percent mastery."  T. 103.

Young testified that during the time she worked with M.G., he "was making progress.  He

---

[11]Young also testified that in September 2002, she began attending a four week program at The Reading Institute in Williamstown, Massachusetts regarding "teaching phonemic awareness, phonological processing, and morphology, and how it has to deal with a student who is learning disabled, reading disabled".  T. 34, 35, 36.

didn't progress in every point, but he was making satisfactory progress." T. 48. Young stated that she "would have hoped he would have made more progress," but that Read had warned her, based on M.G.'s dyslexia and test results, that "[in a year] perhaps we could expect three to four months progress." T. 54-55. Young testified that she had no concerns about the Language! program and expected to use it again. T. 54.

Mr. Gavrity stated that he met with Young most months during the school year and she gave him "an overview of how [M.G.] was doing in class and how things were progressing." T. 852.

### 6.     Fourth Grade Progress

According to his fourth grade "Quarter 1" report, M.G.'s progress in language arts, including reading, writing, speaking, and listening, was "satisfactory" or "better than satisfactory" most areas. D. Ex. 4. His ability "to summarize", recognize the "main idea", and "to work independently", however, was "less than satisfactory". *Id*. The report indicated that M.G.'s "ability to express himself in creative writing has increased. Support is necessary for summarization and finding the main idea. [M.G.] has demonstrated correct spelling usage in his writing of previous spelling words." *Id*. In math, science, social studies, art, and music, M.G.'s progress ranged from satisfactory to outstanding. *Id*. In the category of "deportment", including the areas of self-discipline, respect toward others, behavior "in hallways, play ground, and cafeteria", M.G.'s progress ranged between satisfactory and outstanding. *Id*. In the area of showing "appropriate emotional control" M.G.'s progress was "S-/S", meaning "less than satisfactory/satisfactory". *Id*.

M.G.'s fourth grade "Quarter 2" report indicated that his progress in language arts ranged

from "satisfactory" to "better than satisfactory".  *Id*.  M.G.'s Quarter 3 report in the area of language arts indicated that M.G.'s progress was generally  "satisfactory".  *Id*.  His ability to summarize, "discuss important details" and "use class[] time productively", however, was "less than satisfactory".  *Id*.  In math, science, social studies, deportment, art and music, M.G.'s progress ranged between "satisfactory" and "outstanding".  *Id*.

According to the progress reports, by the fourth quarter, M.G. was "not progressing as expected" in the areas of phonetic fluency and non-phonetic fluency, but his reading skills were "emerging" and he was "progressing satisfactorily" in his "ability to use appropriate expression and voice inflection in his reading of connected text" as well as his "independent use of strategies to decode unknown words, syllabication, word families, phonemic knowledge, prefixes and suffixes and context clues."  D. Ex. 5.

In an undated letter, Martha Raftery, M.G.'s fourth grade classroom teacher, wrote that M.G. has "demonstrated competence" in math and social studies, but to "complete class work", M.G. "requires a high level of support from the special education teacher."  D. Ex. 7.  Raftery reported that M.G. has "a small group of loyal friends", gets along with classmates, and often works with his classmates on projects.  *Id*.  Raftery further stated that M.G.'s classroom participation is improving and that his "work shows that he is capable of completing the class work with assistance."  *Id*.

In February 2003, reading teacher Amy Brandoline administered "the Fox In the Box" standardized assessment to M.G.  D. Ex. 8.  Brandoline reported that M.G. "read 85 words correctly, which is an increase of ten from last year.  He read these much more quickly than before.  He rarely stopped to sound out a word."  *Id*.  M.G. was able to "read 44 real words, and

22 [pseudo] words.  Both had decreased by one from last year.  However, he was much faster than

previously.  He didn't need to sound out every word."  *Id*.  Regarding reading accuracy, the report

indicated that M.G. "benchmarked on the level 4 (end of grade 1) book".  *Id*.  M.G. "scored well

in comprehension at all levels.  He was able to retell the stories and answer literal, inferential, and

critical questions."  *Id*.

In a letter dated April 3, 2003, Frederick Ruhe, science teacher, wrote that M.G. was "an

interested, usually enthusiastic student.  He has little difficulty understanding concepts presented

and makes effective use of his time in class. [M.G.] works well in group situations or on an

individual basis.  On occasion he needs redirection but, in general is an active and engaged

participant."  D. Ex. 7.

### 7.    Preparation for 2003-2004 Fifth Grade

In a letter to Mullen dated March 30, 2003, plaintiffs requested that M.G. "attend the

Kildonan School, in Amenia, N.Y. next year as an out of district placement" and that "this

placement be funded by the school district."  D. Ex. 19.  Plaintiffs also requested that the District

provide transportation for M.G. to and from Kildonan.  *Id*.  Mullen testified that she was aware,

prior to learning that plaintiffs planned to enroll M.G. in Kildonan, that they were not pleased

with M.G.'s progress and felt that his grade levels should have been higher.  T. 190.

In a letter to plaintiffs dated March 31, 2003, Mullen advised that the CSE planned to

meet on May 13, 2003 to review plaintiffs' request for special education services for M.G.  D. Ex.

16.

In a letter to plaintiffs dated April 16, 2003, Superintendent Gabriel wrote to outline the

provisions made for M.G. in response to the CSE's recommendations, including the purchase and

implementation of the Language! program recommended by Barbara Read, testing

accommodations, counseling, and small group instruction.  D. Ex. 19.  Superintendent Gabriel

also advised plaintiffs that because the Kildonan School is not approved by the New York State

Education Department, it was "not an option for any of our students."  *Id.*

 As part of the annual review process, on May 8, 2003, M.G. underwent a psycho-

educational evaluation by Thomas Evers, MS/CAS.  D. Ex. 6.  Evers characterized M.G.'s overall

behavior during the assessment as "industrious, pleasant and cooperative."  *Id.*  Evers reported

M.G.'s scores on the TOWRE in sight word efficiency indicated a grade equivalence level of 2.0

and a grade equivalence level of 2.6 in phonemic decoding.  *Id.*  Evers also administered a Piers'-

Harris Children's Self Concept Scale, and stated that "[w]ith respect to his total score" M.G.

"reported a general and positive sense of self-concept and self-esteem."  *Id.*

### a. June 5, 2003 CSE Meeting

 The CSE met on June 5, 2003, to discuss the 2003-2004 IEP.  Mullen testified that CSE

members reviewed M.G.'s progress notes, report cards, teacher comments, special education

teacher testing, and school psychologist testing, and performed observations in order to ascertain

M.G.'s "present levels of performance" and needs in the economic, social, physical, and

management areas.  T. 199.

 Young testified that in order to aid in the development of M.G.'s IEP, she conducted

testing, interviewed M.G.'s teachers, and met with plaintiffs three times.  T. 55.  Young stated

that at the meeting, everyone who had worked with M.G. brought their reports and the CSE

"discussed [M.G.'s] progress through the year."  T. 56.

 Mullen testified that the CSE planned to continue to use the Language! program and

follow Read's recommendations regarding special education services, program modifications, and testing modifications.  T. 199.  Mullen testified that Young felt M.G. was "moving through quite nicely."  T. 201.  Mullen stated that "during that meeting people felt that there was progress being made.  It was not progress that was year long, but . . . Barbara Read also had indicated that progress was going to be slow because you were going back to teaching the basics" of reading, spelling, and writing.  T. 200.

Mullen stated that plaintiffs always offered "a lot of input" during the CSE meetings that they discussed their concerns about M.G.'s emotional condition.  T. 201.  Mullen testified that plaintiffs were concerned about the amount of time M.G. was spending outside the classroom and she explained to them that to implement the Language! program in a small group or one-on-one setting, as Read recommended, M.G. had to be pulled out of the classroom.  T. 202.  Mullen stated that during the meeting plaintiffs informed the CSE that M.G. would be attending Kildonan for the 2003-2004 school year.  T. 203.

According to Mr. Gavrity, plaintiffs objected to the IEP because they felt it was "not going to meet his needs.  He wasn't going to learn under their system.  They had been working with him for five years and he had limited progress throughout."  T. 784.

In a letter dated June 6, 2003, plaintiffs informed Superintendent Gabriel that they were rejecting the CSE's proposed placement and sending M.G. to Kildonan for the 2003-2004 school year, and would seek  reimbursement from the District for M.G.'s Kildonan tuition and transportation costs.  P. Ex. J.

After the June 5, 2003 meeting, Superintendent Gabriel asked Young to review the goals and objectives in the IEP "and to . . . tighten them up a bit and make them more curriculum-

based." T. 57.  Young "went back to the [Language!] curriculum . . . . looked at what [M.G.]

would be expected to master" and broke the goals and objectives "down into quarters so that there

would be a clear picture of what was expected of [M.G.] to master quarterly." *Id*.  For example,

Young testified:

> [M.G.] still had not gotten to the point where we had hoped for him to be so I included
> goals and objectives for not only reading accuracy, but rate of speed per minute and
> that was the first goal.

> [M.G.] needed to learn prefixes and suffixes so that was included as a goal . . . .   I
> broke them down into what the curriculum set forth for each unit of study.  In other
> words, I was specific in the fact that, for instance, he would use suffixes e-d, i-n-g, s,
> apostrophe s, e-s, e-r, e-s-t and e-n.  So each quarter then I could test him and it would
> be very clear to both Parents and to the Committee that he did indeed either
> accomplish that objective or did not.  Those would be - - I would use 30 words
> specifically that had those suffixes on them.

T. 62-63.

In a letter to M.G.'s mother dated July 18, 2003, Superintendent Gabriel advised that

because Kildonan "has not been approved by the Commissioner of the New York State Education

Department to provide special education and related services to children with disabilities in New

York", it had no authority to place M.G. there.  D. Ex. 19.  Superintendent Gabriel further

advised, citing New York State Education law § 4402(4)(d), that the District could only provide

transportation to Kildonan "if the CSE determines that the private school where the student will

receive special education offers substantially similar services to those offered by the Committee

on Special Education." *Id*.

In a letter to Mullen dated August 13, 2003, plaintiffs rejected the CSE's proposed

placement and advised that they intended to enroll M.G. at the Kildonan School for the 2003-

2004 school year at public expense. *Id*.  Plaintiffs stated that they felt "the Language Arts Class is

not an appropriate intervention, as it has not provided meaningful educational benefit over the past year" and that M.G. was "entering 5th grade reading at a 2nd grade level." *Id*. Plaintiffs further wrote:

> The school's response to [M.G.'s] lack of progress is to pull him out of the regular education curriculum for greater amounts of time by increasing his services to include resource room. This further isolates [M.G.] from his peers. This feeling of isolation in combination with his learning disabilities has lead [sic] to a great deal of frustration and lowering of his self esteem in regard to school work and the school environment. These issues overflow into his home life, and we have spent many days with him crying for 2-3 hours and stating that he is "stupid" after a particularly tough day at school or an incident that arose out of his frustration in this learning environment.

*Id*. Plaintiffs again requested that the District provide "daily round trip transportation for [M.G.] to the Kildonan School". *Id*.

In a letter to plaintiffs dated August 15, 2003, Mullen wrote that Superintendent Gabriel "had asked me to schedule a CSE meeting to review your request for transportation for [M.G.]", a CSE meeting was scheduled for August 25, 2003, and that the CSE would "also address the concerns you raise in your letter". *Id*.

### b.      August 25, 2003 CSE Meeting

All CSE members, except special education teacher Young, attended the August 25, 2003 meeting. Mr. Gavrity stated that because Young not there, they "couldn't question her on what changes she was going to be making to the goals and objectives, what strategy changes she was going to be making, what criteria she was going to be using to monitor his progress." T. 792.

According to Mullen, plaintiffs again stated that M.G. was not progressing adequately. T. 218-219. Mullen responded that because the District had been implementing the Language! program for approximately seven months, not enough time had passed to determine whether the program was working. T. 219. Mullen testified that because plaintiffs were "still concerned

18

about [M.G.'s] lack of progress . . . we wanted to make sure that the goals were really portraying the progress in the Language! [c]urriculum." T. 209. Mullen stated that after the meeting, she asked Young to make sure the objectives in the IEP "were clear about what was actually being taught in that curriculum through the goals and objectives." *Id.*

Mullen stated that at the meeting, the CSE learned of plaintiffs' belief that the District had not responded adequately to M.G.'s emotional issues, *i.e.*, crying, outbursts, and frustration. T. 234. Mullen testified that the CSE was concerned about M.G.'s emotional issues, which they believed were "due to his academics". *Id.* Mullen stated that the CSE offered counseling, a functional behavioral assessment, and a psychiatric evaluation. T. 235-36. Mullen testified that plaintiffs responded that they had spoken with M.G.'s pediatrician about his emotional issues and they did not want to pursue the CSE's offers at that point. T. 236.

Mullen stated that she gave plaintiffs the "opportunity to call and ask us or meet with Mrs. Young after the fact if they had any questions regarding that IEP." T. 300.

In a letter to plaintiffs dated August 29, 2003, Mullen wrote that the CSE revised M.G.'s 2003-2004 IEP to address the emotional issues plaintiffs had described and "to better define the specifics of the special education instruction he would have received if he returned to the District." D. Ex. 3. Mullen wrote that based on plaintiffs' concerns, the CSE recommended that M.G. undergo a psychiatric evaluation and functional behavioral assessment so that the District could "construct a behavioral plan, if needed." *Id.* Mullen advised plaintiffs that in response to their concerns about M.G.'s reading program, she had "Sandy Young, draft specific goals and objectives, as discussed at the meeting, that track the curriculum she has been using with him." *Id.* Finally, Mullen informed plaintiffs that the CSE considered and denied their request for

19

transportation to Kildonan "based on its determination that the Kildonan School, which provides small group instruction exclusively to students who are disabled, is not similar to the program recommended by the District." *Id*.

Mullen testified that the CSE denied plaintiffs' transportation request because the statute required the programs be similar before a District could cover transportation costs and the CSE found that Kildonan, which was self-contained, and District's program, which recommended that M.G. stay in mainstream education, were different.  T. 256.

In a letter to Mullen dated September 2, 2003, plaintiffs stated that M.G. would be attending Kildonan for the 2003-2004 school year.  D. Ex. 2.  Plaintiffs stated they were "surprised" with the content of Mullen's letter because "[a]t no time during the CSE meeting" were they asked for "consent to conduct a functional behavioral assessment or psychiatric evaluation." *Id*.  Plaintiffs attached "the signed consent form" to their letter and requested that the District provide copies of "the tests that will be administered and the reasons for these tests."  P. Ex. P.

### 8.    2003-2004 IEP

The 2003-2004 IEP classifies M.G. as having a learning disability.  D. Ex. 3.  The IEP reports M.G.'s April 12, 2003 WIAT testing results: basic reading score "SS 82, grade level 2.4"; spelling "SS 90, grade level 3.6"; reading comprehension "SS 89, grade level 3.1"; listening comprehension "SS 116, grade level 7.9";  and written expression "SS 96, grade level 3.9". *Id*.

The IEP also reported M.G.'s May 2003 Test of Word Reading Efficiency (TOWRE) results:  "Sight word efficiency, SS 77, grade level 2.0; Phonemic decoding efficiency, SS 89, grade level, 2.6.  Total word reading efficiency standard score - 80." *Id*.

The IEP stated that M.G. needs: "to continue to develop decoding skills to enhance spelling, automaticity, fluency and reading comprehension"; "encouragement to tackle unfamiliar words"; and "assistance in understanding word problems in math". *Id.*

The IEP recommended that M.G.: be placed in a special language arts class five times per week for 60 minutes per day; receive resource room services five time per week, for 40 minutes per day; and receive consultant teacher services in science and social studies class twice per week and services from a teaching assistant in science and social studies on the remaining three days of the week. *Id.* Regarding removal from the general education environment, the IEP explained that M.G. required "individualized and intensive instruction in a separate location as well as opportunities for preview and repetition of key concepts in science and social studies". *Id.*

The IEP recommended that M.G. receive certain program modifications, accommodations, and supplementary aids and services, including: testing accommodations; study guides for science and social studies; "organizers for all writing assignments in social studies and science"; simplification and clarification of directions from teachers;  assistance with comprehension of questions involving math word problems; "several exposures and extra examples when introducing new concepts"; small group discussions involving assigned reading; quiet time to regain control when needed; books on tape for home use; preferential seating; modification of homework assignments; outlines and visual cues in all classes; and parent conferences with consultant and homeroom teacher.  *Id.*

Attached to the IEP are fourteen pages of annual goals and objectives or benchmarks related to reading and writing, including criteria, procedures, and schedule for completion.  *Id.* For example, the first goal states: "Given a text at his instructional level and one minute to read,

[M.G.] will read with 90% accuracy and at a rate of 100 wpm." The objective indicates 90% means a rate of 70-75 words per minute. The procedure indicated "2 instructional reading passages per q[uarter]." The schedule for completion indicated "1st q[uarter]." *Id*.

Finally, the IEP included several goals related to M.G.'s self-esteem, personal confidence, and behavior and specified that M.G. would work on these goals once each week for 30 minutes. *Id*. The IEP recommended that M.G. receive counseling services once each week for 30 minutes, and behavioral consultation "indirect with staff (social worker or psychologist)" monthly for one hour. *Id*. According to the IEP, M.G.'s progress would be measured through teacher reports and counseling notes. *Id*.

Mullen testified that pursuant to the IEP, M.G.'s only non-mainstream class was language arts. T. 240. Mullen explained that the CSE recommended that M.G. receive support during the 2003-2004 school year in the resource room where students are taught the regular education curriculum in a small group to prepare them for their regular education classes. T. 238-39. According to Mullen, the amount of time M.G. was recommended to be pulled out of the mainstream during 2003-2004 school year was less that the previous year. T. 259.

Young stated if M.G. had returned to the elementary school for the 2003-2004 school year, he would have been grouped with the same students as he had been during the 2002-2003 school year, T. 76, and she:

> would have been teaching direct instruction to [M.G.] using the Language curriculum. In the resource room, I would have used the content areas as a means to assure that [M.G.] was using the skills he had learned with the Language curriculum in the areas of social studies, science. As a consultant teacher, I would have supported [M.G.] in science, whether it be in reading, in any kind of project related things, reports . . . . In social studies, I would have supported [M.G.] there as well.

T. 67.

### 9.      2003-2004 Fifth Grade

Kildonan Academic Dean Robert Lane testified that he met M.G. when he began fifth grade at Kildonan.  T. 1036.  Dr. Lane explained that the "criteria for admission at Kildonan is very strict because we serve a very specific population.  All of our students either have to be 'labeled dyslexic' or have a valid psychoeducational evaluation that demonstrates dyslexic traits and patterns or a specific learning disability that is language and reading-based."  T. 1038.  Dr. Lane stated that M.G. "fit all of those criteria well."  *Id*.  Dr. Lane testified that M.G.:

> is someone who not only has a core phonological deficit or has difficulty with the phonology of language, but also has difficulty with short-term memory and processing of information.  So those two difficulties, which are two primary requisites for reading to take place were not hard wired typically in [M.G.], meaning that he was not someone who was going to learn how to read from a typical curriculum in Kindergarten and First Grade into Second Grade.

T. 1038-39.  Lane further explained that given M.G.'s specific disability:

> it is going to take a lot longer . . . to help train his brain to understand those very basic concepts, that different individual[] letters have individual sounds . . . .  Those kinds of pieces are constantly going to interfere with his initial learning.  And for a student like [M.G.] . . . it would not be uncommon for him to take a good two years to be able to see more success or I don't want to say grade level, but more success with applying those basic skills.

T. 1057-58

According to a Kildonan School document by Kristen DiFiore dated November 26, 2003, M.G. worked hard in "language training", completed all work, and maintained a positive attitude.  P. Ex. R.  DiFiore described the phonics concepts M.G. was practicing, as well as M.G.'s progress in spelling, diagraming sentences, and reading.  P. Ex. R.

In a Kildonan document dated November 26, 2003, Dawn Nieman commented that:

> [M.G.'s] success and enthusiasm for math is contagious in our class.  He excels in the areas of class assignments, mad minutes, and bonus boards.  His quick thinking and

> logic skills allow him to succeed in all areas of math this term.  His 95 average
> reflects his mastery of the basic facts and being able to use them to complete
> assignments and weekly tests.  He enjoys mnemonic devices and patterns discovered
> in class.

*Id*.  In a Kildonan social studies report dated November 26, 2003, Erika Bradway commented that

M.G.:

> listened attentively and enthusiastically participated in discussions.  He remembered
> accurately events and facts when I reviewed information with the class.  He did well
> in our geography activities and carefully worked on creating maps of states and
> territories of the United States.  Although he was sometimes distracted by other
> students, he generally remained focused and worked energeticaly [sic] on projects.
> He worked well independently and understood the purpose of each activity.  he
> worked to do his best when he constructed the figures and scenery for our class
> project of the Lewis and Clark expedition.  He was attentive and engaged during our
> class field trip to the Mining Museum.

*Id*.

In a Kildonan "Science 5X" report dated November 26, 2003, Patricia Whelan

commented:

> In the beginning of the term when [M.G.] was asked to give himself an effort grade
> from 1-5 he usually gave himself a three.  I am happy to report that both he and I think
> he has been deserving of a five this last half of the term.  He has a 97 average on
> quizzes which shows he understands the concepts presented in class.  Because he
> seems to catch on to concepts quickly, I would like to see him take a larger part in
> class discussions as I feel his contributions would benefit the class greatly.  He also
> hesitates to answer questions when called on although he usually knows the answer.
> He is [sic] bright boy, and as he becomes more comfortable, I am sure he will make
> his ideas known.

*Id*.

Karen Leopold testified that she was the language training director at the Kildonan

summer camp during the summer M.G. attended.  T. 551.  Leopold stated that M.G. is a "multi-

deficit student with dyslexia, which is a severe form of reading disability."  T. 502.  Leopold

testified that she evaluated M.G. on August 17, 2004, at plaintiffs' request, "to determine the level

of severity of his reading difficulty."  T. 501, 502.  Leopold stated that this testing indicated to her

that M.G. was "making a substantial gain and how he is being taught is making sense to him and

he is being able to . . . transfer that skill directly to these three different areas of reading."  T. 551-

52.

Leopold testified she was concerned Read's recommendations were not "specific enough."

T. 1208.  Leopold also stated that she disagreed with Read's recommendation that a reading

program could be administered in a "one-on-one or small group" setting and explained that in her

opinion, a one-on-one reading remediation program is "much more effective" than a small group

program for a "student of M.G.'s profile".  T. 1209.  Leopold testified that the "various programs"

Read recommends to parents and school districts "are not always accurate in dealing with the

severity of the student if you have a severe dyslexic."  *Id*.  Leopold stated that the Language!

program had limitations.  T. 1210.

Leopold stated that in view of the level of M.G.'s disability, she "would expect slow

progress . . . because this type of instruction takes a number of years to master.  And for a student

with severe impairment, it takes time to get those basic skills down and mastered in isolation

before you see really good progress."  T. 1229-30.  Leopold testified that "[f]or a student like

[M.G.] . . . it takes two to three years for any . . . student to get through it.  For [M.G.] . . . you are

looking at probably taking . . . a good two years to three years to master the curriculum and to

show substantial improvement."  T. 1230.

In a letter to Superintendent Gabriel dated May 14, 2004, plaintiffs requested a due

process hearing based upon their objections to M.G.'s 2003-2004 IEP.  D. Ex. 1.  In the letter,

plaintiffs also requested reimbursement for M.G.'s 2003-2004 Kildonan tuition and transportation

costs. *Id*. Finally, plaintiffs requested a § 504 hearing based on the District's alleged "failure to make reasonable accommodations due to disability to the 15-mile rule for transportation." *Id*.

### B.    Impartial Hearing Officer

A hearing before Impartial Hearing Officer ("IHO") Robert Briglio commenced on June 23, 2004, and concluded on November 15, 2004, after eight days of testimony. District Special Education Teacher Sandra Young, CSE Chairperson Patricia Mullen, District Elementary School Principal Barbara Ulitsky, Karen Leopold of Kildonan, Paul Gavrity, and Robert Lane of Kildonan, testified.

In a decision dated January 9, 2005, the IHO found that although the District "failed to follow the procedural requirement that a special education teacher participate in the [August 25, 2003] CSE meeting, plaintiffs "were not deprived of an opportunity to participate in making recommendations for M.G. for the 2003-04 school year" because a special education teacher was present at June 5, 2003 CSE meeting. IHO Decision, p.15. The IHO next found that "the goals and objectives on the IEP prepared for M.G. by the CSE for the 2003-04 school year were appropriate under the IDEA." IHO Decision, p.17. The IHO further found plaintiffs' argument that "the IEP team failed to consider the full continuum of placement options, and . . . alternatives despite M.G.'s lack of progress in regular education classes" was without merit. IHO Decision, p.20 (citing 34 C.F.R. § 300.551(b)(1)). The IHO explained that "once the School District's CSE concluded that [M.G.'s] needs could be met in general education with supports and services, it was precluded from considering more restrictive placements." IHO Decision, p.21 (citing 34 C.F.R. §§ 300.550; 300.347(a)(3); 300.352(2)). The IHO also found plaintiffs' contention that "M.G. lacked progress in the regular education classes and so required a more restrictive

placement" to be without merit because the record showed that M.G. "performed above substantial numbers of his peers in the general education classes he participated in."  IHO Decision, p.21.  The IHO found the District's failure to provide a class profile to plaintiffs did not deprive M.G. of a free appropriate public education because the CSE informed them that "M.G. would be grouped with the same students as the previous school year, who the parents were familiar with and who had similar needs to M.G."  IHO Decision, pp.21-22.

The IHO found the 2003-2004 IEP, which, *inter alia*, "called for continued . . . use of the multi-sensory, Orton Gillingham based Language! program in language arts to improve M.G.'s reading" provided M.G. a free appropriate public education because M.G. had made "modest but sufficient progress in his area of greatest weakness, reading, and otherwise performed well, above average, in general education classes other than language arts."  IHO Decision, pp. 26, 23.

The IHO found that if it were "necessary to reach" the issue of plaintiffs' placement of M.G. at Kildonan, he "would find that Kildonan is an appropriate program which is meeting the student's needs in the area of his disability - reading and language arts."  IHO Decision, pp.27-28. The IHO stated that he would have, however, limited any tuition reimbursement by 50 percent because plaintiffs "acted unreasonably in this matter by failing to request an impartial hearing until more than a year after they had decided to place M.G. at Kildonan." IHO Decision, pp.29-30, 31.

Regarding transportation, the IHO agreed with the District that plaintiffs were not entitled to reimbursement for their transportation of M.G. to Kildonan during the 2003-2004 school year. IHO Decision, p.33.  The IHO found the "full-time special education placement at Kildonan is not similar to the School District recommendation that M.G. attends regular classes with support

services and special instruction in language arts provided at the . . . elementary school." *Id*. The IHO therefore concluded that N.Y. Educ. Law § 4402(4)(d) precluded reimbursement. *Id*. The IHO also rejected plaintiffs' contention that the District's failure to provide transportation was discriminatory in violation of § 504 of the Rehabilitation Act.  IHO Decision, pp.33-34.

### C.    State Review Officer

Plaintiffs appealed the IHO's decision and the District cross-appealed and, *inter alia*, challenged the IHO's finding that the August 25, 2003 CSE was not properly constituted.  The SRO dismissed both appeals. The SRO found that the "absence of the student's special education teacher from the [August 25, 2003] meeting was a procedural violation" but that it did not deprive M.G. of a free appropriate public education.  SRO Decision, p. 9.  The SRO noted that there was a "significant amount of communication and collaboration" between plaintiffs and the special education teacher on an ongoing basis and that an "appropriate program" for the 2003-2004 school year had been formulated at the June 5, 2003 CSE meeting with the special education teacher's participation.  SRO Decision, p.9.  The SRO further noted that plaintiffs "had input into the development of the goals and objectives prior to the June 2003 CSE meeting," and the chance to review the IEP issued after the August 25, 2003 meeting, but voiced no concern.  SRO Decision, pp. 9-10.  Thus, the SRO concluded, the absence of a special education teacher at the August 25, 2003 meeting did not deprive M.G. of a free appropriate public education.

The SRO next addressed plaintiffs' contention that the IHO erred in finding that the 2003-2004 IEP was adequate substantively.  SRO Decision p.10.  The SRO found that the IEP accurately identified M.G.'s deficits in the areas of: reading decoding, fluency, and comprehension; spelling; written expression; and self-esteem.  SRO Decision, p. 11.  The SRO

also found that the goals in the IEP sufficiently addressed each of the above-mentioned areas of need, pointing out, for example, that in the area of decoding, the IEP set forth "11 supporting objectives . . . in a systematic, sequential approach" and that "the counseling goals relate to concerns regarding the student's confidence and self-esteem." *Id*.

The SRO found the IEP provided "for the use of appropriate special education services" and that the recommended program "was reasonably calculated to confer educational benefits to the student and likely to produce progress." *Id*. The SRO relied on Young's testimony that M.G.'s progress under the Language! curriculum during the 2002-2003 school year was satisfactory. SRO Decision, p.12. The SRO also relied on Young's testimony that Read had "advised her that she could expect the student to make three to four months' progress in one year". *Id*. The SRO noted that Kildonan's academic dean similarly testified that given M.G.'s difficulty with the phonology of language, short -term memory, and processing of information, "it was going to take longer for [him] to understand basic concepts". *Id*. In light of this evidence, the SRO concluded that "M.G.'s progress using the Language! program was meaningful in light of the limitations imposed by his disability", and therefore, that the District, which planned to continue the Language! program during the 2003-2004 school year, established that it offered to provide a free appropriate public education. *Id*. Thus, the SRO found no need to consider whether Kildonan was an appropriate placement. *Id*.

## III.   ADMINISTRATIVE RECORD  2004-2005 School Year[12]

The administrative record formed as a result of plaintiffs' request for a hearing regarding their entitlement to reimbursement for M.G.'s Kildonan tuition and transportation costs for the

---

[12]All citations in this section are to the hearing transcript and exhibits from the Administrative Record for the 2004-2005 school year unless otherwise noted.

2004-2005 school year consists of numerous documents, more than 700 pages of hearing

testimony, a decision by the IHO Dolores Freed, and a decision affirming the IHO by SRO Paul

Kelly.  The record, in relevant part, is summarized below.

**A.      Facts**

**1.      Preparation for 2004-2005 School Year Sixth Grade**

In a letter to Superintendent Gabriel dated March 23, 2004, plaintiffs requested

transportation for M.G. to Kildonan for the 2004-2005 school year.  P. Ex. Y.  Mullen testified

that in May 2004, to aid in the development of M.G.'s 2004-2005 IEP, she and Young went to

Kildonan to observe M.G. and attended M.G.'s social studies class and one of his tutoring

sessions.  T. 62.

May 2004 testing results indicated that M.G. scored at the grade equivalent level of 4 on

the WRAT-3 word identification test.  D. Ex. 4.  M.G.'s scores on the Gray Oral Reading Test

("GORT") indicated that: his reading rate improved from a grade equivalent of 1.7 in November

2003 to 2.0 in May 2004; his reading accuracy improved from a grade equivalent of 2.7 in

November 2003 to 3.4 in May 2004; and, his reading fluency improved from a grade equivalent

of 2.2 in November 2003 to 2.7 in May 2004.  *Id*.  M.G.'s scores on the Gates-McGinitie Reading

Test indicated that: his vocabulary decreased from a grade equivalent of 4.2 in November 2003, to

4.0 in May 2004; his comprehension improved from a grade equivalent level of 4.1 in November

2003 to 4.5 in May 2004; and, his "total reading", improved from a grade equivalent of 4.1 in

November 2003 to 4.2 in May 2004.  *Id*.  M.G.'s May 2004 WRAT spelling scores indicating a

3.0 grade equivalent were the same scores he had obtained in November 2003, and therefore

showed no change.  *Id*.  M.G.'s "Ayres Copying Speed" improved from the grade equivalent of

4.0 in November 2003 to 5.3 in November 2004.  *Id*.

In a report dated June 8, 2004, Kildonan tutor Kristen DiFiore, wrote that M.G. "worked hard to improve his expressive language skills", began typing, which he "learned effortlessly", and learned prefixes, suffixes, and Latin roots.  *Id*.  DiFiore reported that M.G.'s writing "has become more descriptive and interesting", that he could write "five-paragraph essays by first generating a list of ideas . . . and then organizing them into a well written essay."  *Id*.  DiFiore stated that M.G.'s spring test scores on the GORT "show a marked improvement in [his] reading rate and accuracy", that his scores on the Gates-McGinitie Reading Test "showed that he was able to hold his own with a higher level test", and that his WRAT "scores stayed steady while his copying speed significantly improved."  *Id*.

In a report regarding M.G.'s progress in math dated June 8, 2004, Dawn Neiman stated that M.G. "scored above 90% on all but one weekly test".  *Id*.

In a social studies report, Frances Borden stated that M.G. did not "like to draw and finds it difficult to respond verbally but was usually able to answer written questions correctly and actively collaborated with his classmates".  *Id*.  Borden stated that M.G. "enjoyed internet research and shared knowledge appropriately."  *Id*.

In a science report dated June 8, 2004, Patricia Whelan indicated that M.G. earned an average of 92 percent on quizzes, but had seemed to have difficulty participating in class.  *Id*.

In a letter to plaintiffs dated June 15, 2004, Mullen stated that the District had received information from Kildonan and requested plaintiffs' permission to conduct further testing to assist the CSE in developing the 2004-2005 IEP.  D. Ex. 5.  Mullen testified that plaintiffs provided M.G.'s Kildonan  report cards and progress notes, T. 64, but that the CSE needed to conduct

31

standardized testing prior to meeting because the reports included no test scores, standard scores, or grade equivalence levels. T. 65, 66.

In a letter to plaintiffs dated June 16, 2004, Mullen requested that plaintiffs confirm their availability for a CSE meeting in July 2004 and provide "[a]ny information you deem appropriate to the identification of [M.G.'s] current levels of performance, both strengths and needs". D. Ex. 11. Mullen also requested that plaintiffs return a consent form to authorize the release of "the most current assessments," M.G.'s IEP, and Kildonan reports "to enable [the] B[oard] O[f] C[ooperative] E[ducational] S[ervices] to screen [M.G.] as a possible candidate" for the Specialized Literacy Instruction Program ("SLIP") for dyslexic students. *Id*.

Mullen testified that she and Superintendent Gabriel began to look into the SLIP program after they learned that plaintiffs requested that M.G. be placed outside the District at Kildonan. T. 76. Mullen stated that SLIP was located approximately fifty-five minutes away, T. 100-01, within the Van Antwerp School District and that the:

> class itself was housed in a public school. And the children were allowed to, if need be, mainstream into any core subject area or their technologies; music, arts, phys. ed. They were able to play sports if they wanted to do it. That was offered to them after school. Participate in any other extra curricular activities. They, in essence became part of that school district.

T. 100.

In a letter to Mullen dated June 18, 2004, plaintiffs wrote:

> Attached is the consent form to release information to the Capitol Region BOCES SLIP Program. Please send us a copy of the reports and information that you release to BOCES for our records.

> We also would like information about the SLIP program, including specific information regarding the program for 6th graders. Please include the exact location of the program, how long it has been in existence, the number of students in the program (broken down by grade level), the number of teachers, specifics on academic

subjects and schedules, and staff credentials, training and experience.

P. Ex. X.

In a letter dated June 21, 2004, Lisa Kreutziger, Clerk of the District's Board of

Education, informed plaintiffs that their request that the District transport M.G. to and from

Kildonan had been denied because it was "Beyond 15 miles - No Route".  P. Ex. V.

On July 13, 2004, M.G. took the Woodcock Reading Master Test, which indicated that he

was "reading on a level indicative of a student in the sixth month of the fourth grade."  D. Ex. 10.

On July 20, 2004, M.G. took the Wechsler Individual Achievement Test, Second Edition.

D. Ex. 9.  M.G.'s scores indicated a grade equivalent of: 3.1 in word reading; 4.6 in reading

comprehension; 3.2 in pseudoword decoding; 2.8 in spelling; 3.0 in written expression; 8.8 in

listening comprehension; and 4.8 in oral expression.  *Id*.

### a.      July 22, 2004 CSE Meeting

Mullen stated that, despite an invitation, no representatives from Kildonan attended the

July 22, 2004 CSE meeting.  T. 69.  During the meeting, Lee DiPierro, a BOCES representative,

participated by telephone to explain SLIP.  T. 75.  Mullen stated that Dr. DiPierro "gave us a

generalized view of the qualifications of the . . . teachers that taught the program, that it was a

multisensory approach based on Orton-Gillingham."  T. 94.  Mullen stated that even if enrolled in

SLIP, M.G. would have participated in several mainstream classes, such as math, technology, and

music.  T. 401.

Mrs. Gavrity testified that there was "a lot" of discussion about the SLIP program at the

meeting, T. 562, and that:

> [e]veryone . . . felt that given what they've heard about [M.G.], about the
> programming . . . that was available at SLIP and that would be something that would

33

be good to pursue.  And, so, at that point, it was decided we would continue looking
into . . . following through on an intake process with the SLIP Program.

T. 565.  Mullen testified that Mr. Gavrity was concerned that BOCES students might not be

welcomed into the public school setting in which the program was located but that Dr. DiPierro

"assured him that he had worked with this particular school district and principal for many, many

years . . . . and they felt that it just wasn't an issue."  T. 104.

Mullen testified that since M.G. spent fifth grade at Kildonan, and Kildonan had not sent

any information, the CSE had "quite a bit of discussion" about M.G.'s goals and objectives and

encouraged plaintiffs to get more information from Kildonan.  T. 79, 80.  The CSE decided to

meet again to finalize the IEP.  T. 80.

In an email to plaintiffs sent July 28, 2004, Mullen wrote:

> I received a call from Dr. Depiro [sic] today, he has set up the next part of the intake
> process for Aug. 3rd at 10:00.  He has been able to sched. the principle, classroom
> teacher, reading specilist [sic] and teaching assistant to attend.  Would you like to
> sched. the continuation of [M.G.'s] annual review for the 11th or 12th?  I'll wait to
> hear from you.

P. Ex. W.  Plaintiffs wrote,via email the same day that they would "be there on the 3rd" and could

"schedule the continuation of the annual review for Aug. 12th".  *Id.*.

Mrs. Gavrity testified that in August 2004, she and Mr. Gavrity went to the Van Antwerp

Middle School, where the SLIP program was located, and "spent a couple of hours there . . .

talking to the teacher and seeing the program."  T. 567.

### b.   August 12, 2004 CSE Meeting

 According to the minutes from the August 12, 2004 CSE meeting, the:

> CSE continues to recommend a multisensory reading program to accommodate this
> student's learning disability.  A 30 day review, will take place to evaluate that Walter
> B. Howard  remains  the  appropriate  placement.   Parents  state  that  they  will  be

continuing placement at Kildonan School for the 04-05 school year.  Transportation will not be provided by New Lebanon School District.  Parents signed form to decline their right to have a parent member present at the meeting.

D. Ex. 20.   Mullen testified that at the meeting, the CSE, having obtained some information from Kildonan as well as M.G.'s test results, "tweak[ed] the objectives just a little bit".  T. 89.

Mrs. Gavrity stated at that meeting, plaintiffs learned that the "SLIP people" felt that M.G. "would benefit, that they could meet his needs at SLIP.  That he would be appropriate to be part of that type of program" and that they wanted to meet M.G.  T. 574, 575.  Mullen testified that the SLIP teachers had looked at M.G.'s information and determined he "was a good match and they had an opening for him."  T. 93.

Mullen testified that the CSE's recommendation at the August 12, 2004, meeting was to keep M.G. at the Walter B. Howard Elementary School with special education services.  T. 112. Mullen explained that the CSE was "not yet ready to make a recommendation for [SLIP] because we believed that we still had a program here that would be in the least restrictive environment." T. 77.  Mullen explained that SLIP :

. . . had always - - had been for a year, year and a half on the back burner as a possible option to, in my mind, as the chairperson, to help to avoid litigation.

If . . . the parents . . . felt that strongly about their child being in an outside program, in a smaller setting, that was self-contained, then I felt that . . . we had an obligation to look at that, to try to avoid any type of litigation and to try to mediate that.  So that's why we put SLIP . . . on the table to begin with.

And that just wasn't an option for them.  They . . . did not want SLIP.

They did go through what we asked them to do.  They were very good about that.  But when it came right down to it . . . M had been [at Kildonan] for a year, they were going to continue him there, and that was the end of the story.

T. 105-06.

Mullen further stated that if plaintiffs had indicated to the CSE that they wanted M.G. in the SLIP Program, then she "could guarantee that we would have put SLIP into place.  That would have been the recommendation." T. 106.  According to Mullen, that was clearly stated to plaintiffs "[p]robably ten times in that meeting" but that plaintiffs felt that Kildonan was the best program for M.G., and "that's where they were going to keep him.  It really wasn't up for discussion." *Id*.

Mrs. Gavrity disputed Mullen's testimony and testified  that no one from the CSE told her that plaintiffs could accept the SLIP program if they rejected the IEP.  T. 690.  Mrs. Gavrity further stated that if the CSE had proposed the SLIP program at the August 12, 2004, meeting, she would have accepted the placement.  T. 582.

According to Mrs. Gavrity, at the end of meeting Mullen informed them Sandy Young retired "and that they would be looking for a new teacher to replace her.  And that they were recommending that M return to [the District], and that they'd hire a new teacher who could implement his program here, which would be a continuation of the language curriculum". T. 576.  Mrs. Gavrity stated that the CSE also informed her that if the District could not find a special education teacher by September, "they would consider looking at SLIP".  T. 582.

Mullen explained that the CSE planned:

to offer the SLIP Program at BOCES if we could not find a teacher that was qualified in multisensory approach instruction before September.  So, that's why the September 2nd meeting was scheduled as a 'just in case' meeting.

If we did not have a teacher, then we would re-meet and change our recommendation to the SLIP Program.

If we did have a teacher, then I would just notify the Gs and that would be our recommendation.

T.92.  Mullen testified that at the end of the meeting, plaintiffs informed the CSE that they were sending M.G. to Kildonan for the 2004-2005 school year.

Mrs. Gavrity stated that Mr. Gavrity took M.G. to visit the SLIP Program in August 2004. T.575.

In a letter dated August 18, 2004, plaintiffs informed Mullen that they were rejecting the proposed IEP and placing M.G. at Kildonan for the 2004-2005 school year.  D. Ex. 15.  Plaintiffs also requested daily transportation for M.G. to Kildonan and stated that they intended to seek tuition reimbursement.  *Id.*

In a letter dated August 27, 2004, Mullen reminded plaintiffs that the CSE planned to meet again on September 2, 2004 "to review the request for special education services for your son." D. Ex. 16.

Superintendent Gabriel testified that prior to the start of the school year, the District hired a certified special education teacher who had training in the "Wilson Program"[13] and had taught other dyslexic children.  T. 212, 214.

### c.    September 2, 2004 CSE Meeting

Mullen described the September 2, 2004 CSE meeting as follows:

> . . . it was very quick and to the point.  It lasted about five to seven minutes.  Mr. G came.  Mrs. G wasn't there.  And I explained to them that we had hired a teacher, and we were just having this meeting just to let them - - have the courtesy of letting them know that.

> And at the meeting Mr. G asked me about her credentials.  The . . . majority of the meeting entailed talking about the credentials of the teacher.

---

[13]Superintendent Gabriel stated that the Wilson Program is "a multisensory approach to reading" with "similar aspects to Orton-Gillingham and . . . other multisensory approaches."  T. 214.

> I gave a little bit of information, but I wasn't really comfortable about handing out a lot of resume stuff.  And I asked Mr. G to please contact Mr. Gabriel about that . . . . or the principal here at the school . . . .  And he could also meet with the teacher . . . before school started.

T. 114-115.  Mr. Gavrity testified that at the September 2, 2004 meeting, he asked about the SLIP program and that Mullen told him that it was "not on the table at this time."  T. 694.   Mullen testified that after the CSE meeting was over, Mr. Gavrity "restated that they were sending M to Kildonan."  T. 115.

### 2.      2004-2005 IEP

The 2004-2005 IEP recommended that M.G. return to the District for sixth grade and attend a special education language arts class, outside general education, five times per week, for sixty minutes per day.  D. Ex. 23.  The IEP also recommended that M.G. spend forty minutes each day in the resource room, also outside general education.  *Id*.  The IEP recommended that M.G. attend science and social studies classes in general education and that he receive consultant teacher services in those classes two days per week and teaching assistant services three days per week.  *Id*.  The IEP provided the related service of counseling once per week for thirty minutes. *Id*.  The IEP also recommended a number of program modifications, accommodations, and supplementary aids and services, including, *inter alia*, special seating, books on tape, assistance in comprehension of math word problems, that the consultant receive class plans, notes and tests from class teachers, extra examples when introducing new concepts, modified homework assignments, and testing accommodations.  *Id*.  The IEP stated that the "CSE continues to recommend a multi-sensory reading program to accommodate this student's learning disability. A 30 day review, will take place to evaluate that Walter B. Howard remains the appropriate placement."  *Id.*  The IEP contained reading and writing goals, twenty-three instructional

objectives or benchmarks with specific evaluation criteria, procedures, and schedule. *Id*.

On September 8, 2004 plaintiffs signed an admission contract for M.G. to attend Kildonan for the 2004-2005 school year. P. Ex. Z. Mrs. Gavrity testified that she and Mr. Gavrity placed M.G. at Kildonan because they felt the program the District offered "would not meet his needs." T. 545. Mrs. Gavrity further stated that M.G. had been in the District's program for fourth grade and that they believed he "needed a much more intensive program." T. 546. Mrs. Gavrity stated that M.G. "needed all of the language concepts being reinforced through the whole day. That he needed to be in classrooms where the person who was teaching all of the curriculum was familiar with . . . how that was taught to children who were learning disabled throughout the whole day." T. 553. Mrs. Gavrity testified that plaintiffs:

> wanted [M.G.] to feel he was part of the . . . school he was in and the curriculum. And when he was [in the District] in fourth grade and being pulled out, and then in the class, and pulled out for resource room support . . . he quite often felt he was not part of the regular classroom. He was very upset. He felt stupid. He had other kids ask him why he had to go to those classes for the stupid kids.

*Id*. Mrs. Gavrity explained that M.G. would:

> come home at night and cry about being stupid and feeling stupid, because he couldn't be part of what was going on in the regular classroom.
>
> So we didn't feel that, although this might physically seem to be least restrictive in terms of you're in a public school, we didn't feel for him it was least restrictive because he was feeling awful about himself.

T. 554.

Mrs Gavrity testified that:

> when it was recommended that he go back to [the District] to the same type of program he was in in the fourth grade, where he was pulled out - - and, in fact, he was going to be pulled out more because he needed more support for content curriculum. He was going to be pulled out not just for Language Arts, but now resource room was added into the IEP. So he'd be pulled out for more support, to come out and work,

that we just felt that wasn't going to be intensive enough, that it wasn't going to be all of his curriculum being taught, modified the way he can access it and learn it as it was when he was in the more intensive setting at Kildonan.

T. 556.

In a letter to Superintendent Gabriel dated June 21, 2005, plaintiffs requested a due process hearing to object to the 2004-2005 IEP "given to us at the August 12, 2004 meeting as inappropriate due to repetitive programs that fail to address [M.G.'s] individual needs".  D. Ex. 1. Plaintiffs also sought reimbursement for tuition at Kildonan for the 2004-2005 school year as well as transportation costs.  *Id.*  Additionally, plaintiffs requested a "504 hearing for failure to make reasonable accommodations due to disability to the 15-mile rule for transportation."  *Id.*

## B.    IHO Decision

A hearing before IHO Dolores Freed commenced on July 28, 2006, and concluded on August 8, 2005, after three days of testimony.  Mullen, Gabriel, and plaintiffs testified.  On September 19, 2005, the IHO issued a decision finding the 2004-2005 IEP "was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment."  IHO Decision, p.21.  The IHO found that plaintiffs failed to inform the CSE that they wanted M.G. to attend the SLIP program, and that despite the opportunity to request another CSE meeting to discuss SLIP, plaintiffs rejected the IEP and enrolled M.G. in Kildonan.  IHO Decision, p.22.  The IHO found that the District "could not pay for transportation" to Kildonan because "the District had a viable program available."  IHO Decision pp.22-23.  Accordingly, the IHO found "for the District on all counts."  IHO Decision, p 23.

## C.    SRO Decision

Plaintiffs appealed the IHO's decision and State Review Officer Paul Kelly dismissed the

appeal in a decision dated December 12, 2005.  The SRO summarized plaintiffs' appeal as

follows:

> They seek recourse for the CSE's failure to "recommend an IEP and placement at the
> SLIP placement option in conformity with the recommendations of the CSE."  With
> the exception of claiming that the CSE failed to recommend the BOCES SLIP,
> petitioners do not raise specific challenges to the August 2004 IEP.  Rather, they
> assert that the "level of intervention" recommended for their son for the 2004-05
> school year does not provide a free appropriate public education (FAPE).

SRO Decision, p. 4.  After reviewing the record and evidence the parties submitted, the SRO

found that the 2004-2005 IEP recommended a program with appropriate special educational

services that was reasonably calculated to enable M.G. to receive educational benefits.  SRO

Decision, p. 6.  The SRO also found, contrary to plaintiffs' arguments, that the required CSE

members were present at the September 2, 2004 meeting and the CSE did not generate a new IEP

at that meeting.  *Id*.  The SRO found that the CSE investigated SLIP in an effort to accommodate

plaintiffs' preference for a more restrictive environment, and held SLIP was an option in the event

that the District did not find a qualified special education teacher for the 2004-2005 school year.

*Id*.  The SRO further found that there was nothing in the record to support plaintiffs' assertion that

the CSE recommended SLIP, at any point, and therefore concluded plaintiffs' contention that the

CSE changed its recommendation from SLIP to the elementary school at the last minute was

without merit.  SRO Decision, p. 7.  Accordingly, the SRO dismissed plaintiffs' appeal.  *Id*.

## IV.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive

law determines which facts are material; that is, which facts might affect the outcome of the suit

under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).

Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in

dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine

issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With

respect to any issue on which the moving party does not bear the burden of proof, it may meet its

burden on summary judgment by showing that there is an absence of evidence to support the

nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the

nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R.

Civ. P. 56(e).  A trial court must resolve all ambiguities and draw all inferences in favor of that

party against whom summary judgment is sought.  *See Ramseur v. Chase Manhattan Bank*, 865

F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d

Cir. 1985).

   **B.    IDEA**

      In their first claims for relief, plaintiffs allege that the District violated the IDEA by failing

to provide M.G. with a free appropriate public education and seek reimbursement for M.G.'s

tuition and expenses at Kildonan.  As the Second Circuit has noted:

> a motion for summary judgment in an IDEA case often triggers more than an
> inquiry into possible disputed issues of fact. Rather, the motion serves as a
> "pragmatic procedural mechanism" for reviewing a state's compliance with the
> procedures set forth in IDEA and determining whether the challenged IEP is
> reasonably calculated to enable the child to receive educational benefits.

*Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)

(citing, *inter alia*, *Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 & n. 6 (E.D.N.Y.

1996) (analogizing the role Rule 56 motions play in allowing courts to review administrative

determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative review of Social Security determinations)).

The role of the reviewing court in assessing the application of the IDEA's provisions to the facts of a particular case is a mixed question of law and fact.  *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64 (2d Cir. 2000).  The Court's role in making this assessment is "circumscribed" under the IDEA and the Supreme Court's decision in *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982).   "The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers."  *Walczak*, 142 F.3d at 129.  Although their "rulings are then subject to 'independent' judicial review", this "'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 205, 206).  Accordingly, when the state hearing officer's review has been "thorough and careful", the court is "expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Id.* (quoting *Rowley*, at 206, 208) (internal quotation marks omitted).

The IDEA provides that the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

In this case, plaintiffs seek reimbursement for M.G.'s tuition and costs at Kildonan for the 2003-2004 and 2004-2005 school years.  The parties exclusively rely on the two administrative

records; they have not submitted additional evidence.[14]  To obtain retroactive reimbursement for

the cost of private school, the parents must establish that: (1) the IEP the school district proposed

was inappropriate; and (2) the private placement was appropriate to the child's needs.  *See*

*Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *see also Gagliardo v.*

*Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) ("The party who commences an

impartial hearing . . .bears the burden of persuasion") (citing *Schaffer v. Weast*, 546 U.S. 49, 57-

58 (2005)).  Even if the parents satisfy these two factors, the decision whether to award tuition

reimbursement is within the Court's discretion.  20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a

hearing officer may require the agency to reimburse the parents for the cost of [private]

enrollment.")  "It is well established that 'equitable considerations are relevant in fashioning

relief' under the IDEA."  *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir.

2000) (quoting *Burlington*, 471 U.S. at 374).

### 1.    2003-2004 IEP

Since plaintiffs seek reimbursement for M.G.'s tuition and costs at Kildonan for the 2003-

2004 school year, they must show that the 2003-2004 IEP was inappropriate.  The question of

appropriateness requires the Court to "assess (1) whether the state complied with the procedural

requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to

enable the child to receive educational benefits.'"  *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of*

*Ed.*, 546 F.3d 111, 118 (2d Cir. 2008) (quoting *Rowley*, 458 U.S. at 206-07).

### a.    Procedural Adequacy

---

[14]Defendants have submitted an affidavit by Patrick Gabriel.  *See* Dkt. No. 19-3.  The affidavit pertains solely to the issue of plaintiffs' request that the District transport M.G. to and from Kildonan.

"The initial procedural inquiry is not mere formality . . . . 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'"  *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206).  An IEP must articulate:

> "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."

*M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers*, 231 F.3d 960 at 102-03 (2d Cir. 2000) (quoting *Walczak*, 142 F.3d at 122).

### i.      Baselines/Present Levels of Performance

Plaintiffs assert that 2003-2004 IEP's statement of M.G.'s present levels of performance, or "baselines", was absent or inadequate, and therefore assert any progress toward the IEP's goals would not be measurable.  The District contends that the SRO properly rejected plaintiffs' argument because the record shows the CSE considered, and the IEP included, M.G.'s recent evaluations, test results, and progress in all relevant areas.

In this case, the SRO found that the IEP "reflects current evaluations that identify the student's deficits in reading decoding, reading fluency, reading comprehension, spelling and written expression, as well as concerns regarding his self-esteem."  SRO Decision, p. 11. Plaintiffs, however, argue that the IEP's statements regarding M.G.'s present levels of performance should have been more specific and corresponded directly to each goal.  For

example, plaintiffs point out the IEP contains goals relating to prefixes and suffixes, but does not indicate M.G.'s present level of performance in the area of prefixes and suffixes.

Although the IEP does not state whether M.G. could read words with prefixes and suffixes, it describes M.G.'s present level of performance in reading and identifies the areas in which he still has had difficulty.  For example, the IEP states that M.G. has learned the rules of doubling letters and adding affixes in writing and spelling.  The IEP also contains M.G.'s WIAT testing results in basic reading, spelling, reading and listening comprehension, and written expression as well as his TOWRE testing results in sight word efficiency and phonemic decoding efficiency.  The IEP notes M.G.'s apparent enjoyment of reading and indicates that his "reading level and reading rate have increased".  The IEP flags, as areas of concern, M.G.'s "fluency" as well as his tendency to "give up" when reading rather than attempting to decode or "thoroughly analyze" an unknown word.  The IEP further states that M.G. needs to "continue to develop decoding skills to enhance spelling, automaticity, fluency, and reading comprehension."  Viewed together, these statements show that the IEP contained adequate baselines and statements of present levels of performance from which M.G.'s reading progress in fifth grade could be measured.  Thus, the Court declines to find the absence of a specific baseline regarding prefixes and suffixes renders the IEP inadequate and defers to the SRO's conclusion that it reflected current evaluations which identified M.G.'s deficits.

Plaintiffs next assert the IEP's statement that M.G.'s "ability to write longer and more detailed pieces have increased" is a vague and therefore inadequate statement about M.G.'s present writing level.  The IEP, however, contains ample information about M.G.'s present level of performance in the area of writing.  The IEP indicated that WIAT testing results showed

M.G.'s written expression to be at the 3.9 grade level. Additionally, the IEP reported that M.G.'s "ability to write longer and more detailed pieces ha[s] increased through the use of organizers" and that he is "able to complete a partial outline and then use the outline to write a sequential, comprehensive, piece of written work with support." The IEP also noted M.G.'s need for support when selecting "the most important parts to write in a story or summary." Thus, the IEP adequately states M.G.'s present level of performance in writing and identifies the areas in which he needs to improve.

Plaintiffs assert the IEP's statement regarding M.G.'s frustration "with the language of math" is vague and therefore fails to state M.G.'s present level of performance in the area of math. Plaintiffs' assertion, however, overlooks the portion of the IEP which recited several of M.G.'s math skills, including his knowledge of multiplication facts, and the ability to "multiply and divide 4 digit by 1 digit problems." The IEP also reported that M.G. "enjoys mathematical challenges" and highlights his need for "assistance in understanding word problems in math". When read together with the IEP's recitation of M.G.'s present level of performance in reading, the statement that M.G. "is sometimes frustrated with the language of math" means that M.G.'s frustration and trouble understanding math word problems stem from his difficulty reading. Thus, plaintiff's argument is without merit.

Plaintiffs further contend that there is no adequate baseline from which to measure M.G.'s progress toward the goal of "using appropriate structure, topic sentences, most important details and conclusion" when writing. The IEP, however, indicated that although M.G.'s ability to write longer, more detailed pieces, increased over the prior year using organizers, and he could "complete a partial outline" to use to "write a sequential, comprehensive piece of written work",

he still required "support to choose the most important parts to write in a story or summary."

Thus, if M.G. was able to accomplish the IEP's goal of "using appropriate structure, topic

sentences, most important details and conclusion" in his written pieces of work at the end of the

2003-2004 school year, measurable progress from his performance level in August 2003 would

have been ascertainable.

Plaintiffs argue that the "baselines" in the IEP are so vague that they are "impossible to

use . . . for measuring [M.G.'s ] progress" toward the corresponding goals.  As discussed above,

the record supports the SRO's finding that the IEP adequately stated M.G.'s baselines and present

levels of performance in all relevant areas.  However, to the extent plaintiffs' argument is a

challenge to the sufficiency of the goals in the IEP, it is without merit.

As stated above, the IDEA requires that the IEP include "the annual goals for the child,

including short-term instructional objectives . . . and . . .  objective criteria and evaluation

procedures and schedules for determining, on at least an annual basis, whether instructional

objectives are being achieved".  *M.S.*, 231 F.3d at 102-03 (quoting *Walczak*, 142 F.3d at 122).  In

this case, the IEP  contained fifteen pages of "measurable annual goals and short-term

instructional objectives/benchmarks" pertaining to: reading rate, accuracy, and comprehension;

reading specific suffixes and prefixes, including, *e.g.*, -ed, -ing, -s, and in-, im-, and ir-, reading

"consonant blends", "controlled vowels"; reading "multi-syllable words"; writing outlines and

multi-paragraph essays; vocabulary; grammar; and self-esteem.  Each goal also has specific

criteria by which the teacher can measure M.G.'s progress, as well as a procedure, and schedule

for evaluation.  Thus, for the foregoing reasons, the Court defers to the expertise of the SRO and

concludes that plaintiffs have failed to establish by a preponderance of the evidence that the

baselines, goals, and objectives were inadequate. *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[W]hether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

### ii.    Annual Review

Plaintiffs assert that the CSE failed to conduct an annual review of M.G.'s behavioral and emotional condition.  Plaintiffs assert that although the IEP "reflects needs in social development and self-esteem, and recommends the related service of counseling", it only repeats the 2002-2003 goals in these areas.  Plaintiffs argue that there is "no evidence that the CSE considered any relevant information regarding this area" during the CSE meetings to prepare the 2003-2004 IEP.

Pursuant to 34 C.F.R. § 300.324(b), the CSE is required to review "the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved" and to revise "the IEP, as appropriate".  In this case, the goals and objectives in the 2003-3004 IEP related to self-esteem, personal confidence, and positive behaviors as well as the corresponding evaluation criteria, procedures, and schedule, were identical to those contained in the 2002-2003 IEP.  The record shows, however, that one of the reasons the CSE reconvened on August 25, 2003, was in response to plaintiffs' concerns about M.G.'s behavioral and emotional condition.  Indeed, following the meeting, the CSE added plaintiffs' concerns to the IEP in the area of "Social Development":

> Parents state concerns that [M.G.'s] self esteem has been affected by academic challenges.
>
> Parents report that [M.G.] has become extremely frustrated academically and after a bad day at school may cry for several hours.

> Parents report that they are spending a significant amount of time with [M.G.] to complete homework and prepare for tests.

Additionally, under "Management Needs", the IEP stated:

> [M.G.] should not have to spend an inordinate amount of time on homework or test preparation.

> [M.G.] needs to be in a supportive environment that emphasizes his accomplishments and recognizes success.

> Parents report concerns about behavior interfering with learning: committee recommends a functional behavioral assessment for September with review of data and a behavior plan, if appropriate.

> CSE offered to arrange a psychiatric evaluation to address parental concerns regarding [M.G.'s] feelings about himself.

Thus, contrary to plaintiffs' assertion, the CSE specifically considered M.G.'s current "social development" and "self-esteem" issues.  Moreover, the CSE recommended that M.G. undergo a functional behavioral assessment and made plans to reconvene to address the results of such assessment and devise a behavior plan "if appropriate".  Plaintiffs' argument that the CSE failed to conduct an annual review of M.G.'s social development and self esteem is without merit.

### iii.    Functional Behavioral Assessment

Plaintiffs assert that the IEP is procedurally inadequate because the District should have conducted a functional behavioral assessment prior to formulating the IEP.  The IDEA requires that, in developing an IEP for "a child whose behavior impedes the child's learning," the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(I).  In this case, the record, shows that although the CSE had been aware that M.G. had behavioral issues, it did not know that these issues were interfering with M.G.'s academics until plaintiffs brought the issue to Mullen's

attention in their August 13, 2003 letter.  Upon receiving plaintiffs' letter, Mullen scheduled a

CSE meeting to address, *inter alia*, M.G.'s behavioral issues.  At the August 25, 2003 meeting,

the CSE recommended a functional behavioral assessment and that the CSE reconvene after

receiving the results to amend the IEP if necessary.  Accordingly, the Court finds plaintiffs'

argument without merit.

### iv.        Premature Development of Goals and Objectives

Plaintiffs argue that the "CSE prematurely developed goals and objectives for 200[3]-

200[4] without first collecting and/or considering evaluative data relating to the student's goals

and objectives set for 200[2]-200[3]."  The evidence in the record demonstrates that the CSE

developed the 2003-2004 goals and objectives following a thorough review of M.G.'s progress

during the prior school year.

In this case, even if, as plaintiffs argue, the CSE lacked a complete picture of M.G.'s

progress at the June 5, 2003 meeting because the school year had not ended yet, any deficiency

was cured at the August 25, 2003 CSE meeting, at which point the school year had ended, and all

progress reports were complete.  Further, Young testified that to develop an IEP for M.G., she

"interviewed teachers that he had, homeroom teachers, science, math, social studies teachers.  I

met with the parents."   Thus, plaintiffs' argument is without merit.

### v.        Composition of CSE

Plaintiffs argue that the 2003-2004 IEP is a nullity because no "proper regular education

teacher" and no special education teacher were present at the August 25, 2003 CSE meeting.  The

CSE must include "(1) Not less than one regular education teacher of the child (if the child is, or

may be, participating in the regular education environment); (2) Not less than one special education teacher of the child ".  34 C.F.R. § 300.321(a)(2) and (3).

The IDEA provides that a regular education teacher "shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate positive behavioral interventions and supports, and other strategies, and the determination of supplementary aids and services, program modifications, and support for school personnel".  20 U.S. C. § 1414(d)(3)(C).  In this case, the record shows that Lee Kochenour, fifth grade regular education teacher, was present at the August 25, 2003, CSE meeting.  Additionally, the IEP provided that M.G. would be participating in the regular fifth grade education environment for every subject except language arts, for which he would be placed in a special education class.  Thus, plaintiffs' argument that a regular education teacher was not present at the August 25, 2003 meeting lacks a factual basis.

It is undisputed that no special education teacher attended the August 25, 2003 CSE meeting.  Thus, the CSE was not properly constituted and the development of the 2003-2004 IEP was deficient procedurally.  "[H]owever, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA."  *Grim*, 346 F.3d at 381.  Indeed, an IEP is not rendered a "nullity", unless the absence "impeded the child's right to a free appropriate public education", "significantly impeded" the parents' "opportunity to participate in the decision making process", or  "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

"In considering whether the District fulfilled IDEA's procedural obligations", the Court must focus on whether plaintiffs "had an adequate opportunity to participate in the development

52

of [the] IEP." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). To ensure

parental participation, the IDEA requires:

> An opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the identification,
> evaluation, and educational placement of the child, and the provision of a free
> appropriate public education to such child, and to obtain an independent educational
> evaluation of the child.

20 U.S.C. § 1415(b)(1).

In this case, the SRO concluded that the absence of a special education teacher from the

August 25, 2003 meeting did not result in the denial of a free appropriate public education. The

SRO noted that: the final 2003-2004 IEP was the result of "an ongoing collaborative process

characterized by 'ample' parent participation"; the CSE meeting in question was the second to

develop the 2003-2004 IEP, and was held in response to plaintiffs' recently raised concerns; the

special education teacher met with plaintiffs three times prior to the June 5, 2003 meeting to

discuss goals and objectives; the CSE addressed plaintiffs' concerns and revised the goals and

objectives in the June 5, 2003 IEP accordingly; and plaintiffs did not raise any concerns about the

goals and objectives in the August 25, 2003 IEP despite CSE Chairperson Mullen's invitation.

Plaintiffs do not point to any evidence in the record that contradicts the SRO's finding.

Plaintiffs met with Young throughout the preceding school year, and Young attended the June 5,

2003, CSE meeting, during which the majority of the IEP was formulated. Following the August

25, 2003 meeting, the CSE added a number of program modifications, accommodations, and

supplementary aids and services to the IEP. After the meeting, Young, at Mullen's request,

provided more detailed language arts goals, objectives, and benchmarks. As the SRO stated,

plaintiffs were involved at every step, and Mullen informed them that they could contact the

District with any concerns about the IEP.  Plaintiffs did not raise any concerns about the goals and objectives.  Thus, there is no evidence that Young's absence from the second CSE meeting impeded plaintiffs' ability to participate the decision-making process, or deprived M.G. of educational benefits, or denied M.G. a free appropriate public education for the 2003-04 school year.  Accordingly, the Court finds no reason to disturb the SRO's conclusion in this regard.

### b.    Substantive Adequacy

Plaintiffs argue that the 2003-2004 IEP is inadequate substantively because "it lacks information about the student's disabilities, including his dislike of public school" and in order to become "an independent reader and learner, and an emotionally healthy person, he needs more than that offered by" the District.  The District contends that the SRO properly concluded that the IEP was likely to enable M.G. to progress in fifth grade is supported by the evidence and entitled to deference.

"An appropriate education is one that is 'likely to produce progress, not regression.'" *Walczak*, 142 F.3d at 130 (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (internal citation omitted).  A state need not "'maximize the potential of handicapped children,'" but open the door of public education in a "'meaningful' way," and provide the opportunity for more than "'trivial advancement.'"  *Id.* (quoting *Rowley*, 458 U.S. at 189, 192, and *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997)).  To conduct an "independent" review of the IEP at issue without "impermissibly meddling in state educational methodology," *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d at 1121 (citing *Rowley*, 458 U.S. at 203, 207), the Court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan".  *Walczak*, 142 F.3d at 130.

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.

Here, the SRO found the 2003-2004 IEP substantively adequate.  Plaintiffs assert that the SRO's finding was in error because the IEP recommended the same plan as the 2002-2003 IEP, *i.e.*, use of the Language! program, under which, they assert, M.G., at best, made no progress, and, at worst, regressed.  In support of their assertion, plaintiffs cite M.G.'s WIAT test scores, which indicated that his basic reading skills had decreased from the 2.9 grade equivalent (27th percentile) at the end of third grade to the 2.4 grade equivalent (12th percentile) at the end of fourth grade.  Plaintiffs also cite Brandoline's February 2003 reading evaluation in which she reported that M.G. decoded one word less than he had in 2002, and that, though he was in fourth grade, his reading accuracy had not yet reached the "end of grade 2" level.  Also demonstrating the inadequacy of the 2003-2004 IEP, plaintiffs argue, is evidence showing that, even after receiving instruction under the Language! program, M.G. met none of the goals in the 2002-2003 IEP and only two of the 48 objectives.  Plaintiffs contend that M.G. had become "upset about school" and "hated to go to school" because of his academic difficulties.  Plaintiffs also point out that the 2003-2004 IEP reduced the amount of time M.G. would have received in special education language arts.

In a detailed discussion, the SRO addressed each of plaintiffs' arguments.  The SRO acknowledged that M.G.'s performance on the standardized tests was "inconsistent" and that he did not meet objectives, but found that "the assessment tools provided by the Language! program shows progress in his identified areas of need."  In making this finding, the SRO relied on

documentary evidence showing that M.G. "successfully accomplished the criteria for mastery" of objectives regarding phonetic fluency on most of the drills Young administered as part of the Language! program.

The record supports the SRO's finding.  The forms containing the IEP's 2002-2003 annual goals and objectives regarding M.G.'s writing skills indicated that although M.G. did not meet the objectives, he was "progressing satisfactorily" toward each one and his spelling skills were "emerging".  Second quarter reports regarding reading fluency indicated that M.G.'s skills were "emerging" and that he was "progressing satisfactorily," and had met the goal of reading non-phonetic words.  Third quarter reports stated that although he was "progressing satisfactorily" in the areas of phonetic fluency, non-phonetic fluency, and use of expression and voice inflection when reading, his reading rage of words per minute was "not progressing as expected" at 69 words per minute.  During the fourth quarter, M.G.'s teacher reported that M.G. was "not progressing satisfactorily" on his phonetic fluency drills and non-phonetic fluency drills because he had not achieved the criteria for mastery specified for the fourth quarter of reading 55-70 words per minute and 80-100 words per minute in the respective areas.  The record showed, however, that M.G. had "progressed satisfactorily" or met the goals for these two areas in the second and third quarters.  Thus, there is evidence that M.G.'s reading rate in the areas of phonetic and non-phonetic fluency had improved since the beginning of the school year.

Additionally, M.G.'s teacher indicated that by the fourth quarter, M.G.'s "independent use of strategies to decode unknown words, syllabication, word families, phonetic knowledge, prefixes and suffixes and context clues" was "progressing satisfactorily".  In the area of "comprehension skills", M.G. progressed "satisfactorily" toward each specified objective in the

second, third, and fourth quarters, and his "ability to summarize in his own words, information

presented orally or in writing" was "emerging" during the fourth quarter.  Thus, the evidence

shows that even if M.G. did not meet all the goals set for him during fourth grade, he had made

progress since the beginning of the year.

In addition to the documentary evidence, the SRO relied on testimony by Young, M.G.'s

special education teacher, and Kildonan Academic Dean Robert Lane, in support of his

conclusion that the IEP was "reasonably calculated to confer educational benefits", and, more

specifically, that M.G.'s progress under the Language! program, though slow, was meaningful in

light of his disability.  At the hearing, Young testified that she believed M.G. "was making

progress . . . the progress was not rapid progress, but he was making progress.  He still had

difficulties in the realm of the . . . fluency drills and the reading rate".  Young further explained

that she "would have hoped he would have made more progress, however, in speaking with Mrs.

Read, she had said that perhaps we could expect three to four months progress" in a year.  T. 54-

55.  Kildonan Academic Dean Robert Lane testified that M.G. "not only has a core phonological

deficit" and  "difficulty with the phonology of language," but he "also has difficulty with short-

term memory and processing of information".  Given M.G.'s specific disability, Lane explained,

"it is going to take a lot longer . . . to help train his brain to understand those very basic concepts,

that different individual[] letters have individual sounds . . . . Those kinds of pieces are constantly

going to interfere with his initial learning.  And for a student like [M.G.] . . . it would not be

uncommon for him to take a good two years to be able to see more success or I don't want to say

grade level, but more success with applying those basic skills."  T. 1057-58.  Thus, the SRO had

an adequate basis on which to conclude that M.G.'s progress under the Language! program was

meaningful in light of his disability and therefore that the IEP's recommendation of continued use of the Language! program was calculated to enable M.G. to progress.  The Court accords deference to the SRO's conclusion.

Plaintiffs assert that the 2003-2004 IEP's reduction in the amount of special education language arts instruction would hinder M.G.'s progress.  The 2002-2003 IEP provided for 108 minutes per day in language arts.  Although the 2003-2004 IEP only provided for 60 minutes per day in language arts, it also provided for 40 minutes per day in the resource room.  Young testified that the 2003-2004 IEP "was written as five times 60 [minutes] because that is the time that Fifth Grade had language arts.  And I added a resource room so we could work on skills in the content area, use what he learned in the language arts to work on skills in the content areas." Ultimately, Young explained, when language arts and resource room times are combined, the difference in the amount of time M.G. would spend in special education language arts during the 2003-2004 school year was eight minutes per day.  T. 87.  Thus, plaintiffs' argument is without merit.

Further, contrary to plaintiffs' assertion that the IEP fails to acknowledge M.G.'s emotional difficulties, the IEP specifically accounted for M.G.'s behavioral and self esteem issues, which the parties believed to be related to his academic struggles, by recommending counseling on a weekly basis.

To the extent plaintiffs argue the IEP was inadequate because the District failed to implement any of the other suggestions offered by Read in her evaluation, their argument is without merit.  A school district complies with the IDEA's substantive requirements if the IEP is "reasonably calculated enable the child to receive educational benefit[s]", *Rowley*, 458 U.S. at

207.  "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential.'" *Cerra*, 427 F.3d at 195 (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995) (school districts "need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity' ")).

Here, the District recommended the implementation of many of Read's proposed modifications, including the use of the Language! programs in a small group setting.  That the District did not purchase every program Read recommended does not render the IEP inadequate because, as the Court has found, the record supports the SRO's conclusion that the IEP was likely to enable M.G. to make educational progress.

As a final matter, the evidence uniformly shows that M.G. achieved passing test scores and progressed at or above the level of his classmates in each of his mainstream classes, math, science, and social studies.  T. 441, D. Ex. 20.  Based on all of the above, and in the absence of additional evidence or any objective evidence to the contrary, the Court concludes the SRO's thorough and well-reasoned decision is entitled to deference. Accordingly the Court finds that the preponderance of the evidence shows that the 2003-2004 IEP was appropriate, both procedurally and substantively.

Having found that the District offered M.G. a free appropriate public education, the Court need not reach plaintiffs' argument that their unilateral placement of M.G. at Kildonan was appropriate.  Accordingly, defendants' cross-motion for summary judgment on plaintiffs' IDEA cause of action concerning the 2003-2004 school year is granted and plaintiffs' motion for

summary judgment on their IDEA cause of action concerning the 2003-2004 school year is denied.

### 2.     2004-2005 IEP

Plaintiffs contend that the 2004-2005 IEP was inappropriate procedurally and substantively and seek reimbursement for tuition and costs associated with their unilateral placement of M.G. at Kildonan for the 2004-2005 school year.

### a.     Procedural Adequacy

### i.     Annual Review

Plaintiffs assert that the CSE's annual review was deficient because the CSE lacked sufficient information to formulate goals and objectives.  Citing Mullen's "'no brainer' testimony", plaintiffs argue that the CSE failed to meet its annual review obligation because "there was insufficient information upon which to write goals and objectives" at the July 22, 2004 CSE meeting.  Dkt. No. 25-4, p. 10.  The CSE is required to review "the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved" and to revise "the IEP, as appropriate to address . . . any lack of expected progress . . . the results of any reevaluation . . . information about the child provided to, or by, the parents" and "the child's anticipated needs".  20 U.S.C. § 1414(d)(4)(A)(i) and (ii).

Here, the testimony on which plaintiffs rely is Mullen's statement regarding engaging Kildonan in the development of the 2004-2005 IEP and the lack of information the CSE had from Kildonan at the July 22, 2004 CSE meeting.  Mullen testified that it was important for someone from Kildonan to be involved because M.G. "attended the program and they had the information, we did not . . . .  as far as any standardized testing or process reports, how could we develop goals

and objectives without that information.  So . . . that was a no-brainer.  We really needed them at the meeting."  T. 71.  Mullen further testified the CSE encouraged plaintiffs to get the information from Kildonan so that the CSE could develop the IEP and decided to schedule another meeting on August 12, 2004.  T. 79-80, 85.

Mullen stated that Kildonan was invited to participate in the August 12, 2004 meeting, but did not.  T. 86.  Mullen testified that during the August 12, 2004 CSE meeting "after obtaining some information from Kildonan and the testing that was done . . . we did tweak the objectives".  T. 89.  Thus, any deficiency at the July 22, 2004, was cured at the August 12, 2004, CSE meeting.  Accordingly, in light of the evidence that the CSE had received information from Kildonan prior to the August 12, 2004 CSE meeting, plaintiffs have failed to show by a preponderance of evidence that the insufficiency of the information at the July 22, 2004 rendered the CSE's annual review inadequate.

### ii.       Composition of CSE on September 2, 2004

Plaintiffs assert that the District failed to establish that all requisite members were present for the September 2, 2004 CSE meeting.  Generally, the CSE must include the student's parents, a regular education teacher, a special education teacher, a school psychologist, a representative of the school district, and an additional parent member.  8 N.Y.C.R.R. § 200.3(a)(1); 20 U.S.C. § 1414 (d)(1)(B).  According to the evidence the District submitted to the SRO, the following were in attendance at the September 2, 2004, CSE meeting: the school psychologist, the elementary school principal, a regular education teacher, a special education teacher, M.G.'s father, and the CSE chairperson.  Plaintiffs previously waived the presence of an additional parent member, thus

the evidence supports the SRO's finding that all required CSE members were present at the September 2, 2004 meeting.

### iii.    Board of Education Approval

Plaintiffs assert the Board of Education's failure to approve the 2004-2005 IEP until the day after the school year began is a "fatal procedural error".  Pursuant to 20 U.S.C. § 1414(d)(2)(A), "[a]t the beginning of each school year, each local educational agency . . . shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program".  Even assuming the Board of Education's approval of the 2004-2005 IEP the day after the school year began was a technical violation of the IDEA, plaintiffs have failed to show that this delay impeded their ability to participate in the development of the IEP or that it deprived M.G. of an educational benefit.  *See Grim*, 346 F.3d at 381 (recognizing that not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA.").

"It is no doubt true that administrative delays, in certain circumstances, can violate the IDEA by depriving a student of his right to a free appropriate public education." *Grim*, 346 F.3d at 381 (internal quotation marks omitted).   For the reasons discussed below, the Court finds the preponderance of the evidence supports the SRO's decision and shows that the 2004-2005 IEP was adequate to confer educational benefits to M.G.  Further, although plaintiffs contend that the IEP was not formally approved by the Board until September 8, 2004, one day after the school year began, it is undisputed that the CSE finalized the IEP no later than September 2, 2004 and was ready to implement it when school began.  Moreover, there is no evidence that plaintiffs would have changed their decision to send M.G. to Kildonan if the Board approved the IEP prior

to the start of the school year.  *See Grim*, 346 F.3d at 381-82 (finding that an administrative delay did not deprive student of right to a free appropriate public education or cause prejudice because the IEP was substantively adequate, the programs in the IEP "would have been available" to the student "for the years in question", and there was no "suggestion in the record that the Grims would have altered their placement decision had their challenges to the IEPs been resolved in a more timely fashion.").  Thus, the Court cannot conclude that M.G.'s right to a free appropriate public education was compromised by the Board of Education's approval of the IEP one day after the commencement of the 2004-2005 school year.

### iv.    SLIP

Plaintiffs argue that when the CSE issued the IEP on September 2, 2004, it changed M.G.'s recommended placement from SLIP to the District's elementary school at the last minute, depriving M.G. of an educational benefit.  On this issue, the SRO found there was "nothing in the record to support that the CSE recommended the BOCES SLIP, and therefore, nothing in the record to support that the CSE changed its recommendation from the BOCES SLIP to the district's elementary school."  The preponderance of the evidence supports the SRO's finding that the CSE did not recommend SLIP, at any point, for the 2004-2005 school year.

It is undisputed that the CSE seriously considered and discussed SLIP as a placement option for M.G. for the 2004-2005 school year.  Indeed, plaintiffs participated in the intake process at the District's request, M.G. was accepted to the SLIP program, and the District reserved a place for him there.  The record shows, however, that the District pursued SLIP in an effort to avoid further litigation over M.G.'s education.  Mullen testified that she told plaintiffs that if they would accept SLIP for M.G., the CSE would send him there.  There is no evidence,

however, that plaintiffs indicated to the CSE that they would accept SLIP.   Rather, the evidence shows that the CSE, having received no indication from plaintiffs that they would accept a placement at SLIP, recommended placement in general education with special education services because it had reason to believe M.G. would make progress in such an environment as well as an obligation, under the IDEA, to place M.G. in the least restrictive environment possible.

Although plaintiffs testified that they believed the CSE was recommending SLIP for the 2004-2005 school year, no such recommendation was ever reflected in any draft of the 2004-2005 IEP.  Indeed, Mullen testified that the CSE only planned to recommend SLIP in the event the District did not hire a special education teacher before the commencement of the school year. Thus, the preponderance of the evidence supports, and the Court defers to, the SRO's finding that SLIP was never the CSE's recommendation.  Consequently, there is, as the SRO found, no basis on which to conclude that the CSE unfairly changed the recommendation from SLIP to the elementary school at the last minute during the September 2, 2004.  Therefore, plaintiffs were not deprived of the opportunity to participate in the development of the IEP and M.G. was not deprived of an educational benefit.

**b.    Substantive Adequacy**

Plaintiffs contend the 2004-2005, like the 2003-2004 IEP, was unlikely to help M.G. progress.  As stated *supra*, "[a]n appropriate education is one that is 'likely to produce progress, not regression.'" *Walczak*, 142 F.3d at 130 (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (internal citation omitted).

Here, the SRO found "the recommended program was reasonably calculated to enable the student to receive educational benefits."  The SRO credited Mullen's testimony that M.G.'s needs

64

were the same as those identified in prior years.  Mullen explained that the CSE's recommendation was the same as prior years because M.G. had made progress in the Language! program used when he attended fourth grade in the elementary school during the 2002-2003 school year.  The SRO noted that the CSE's recommended program had been developed with the assistance of a private evaluator and found that it was appropriate in light of the nature and extent M.G.'s disability.

Plaintiffs argue that the 2004-2005 IEP was not reasonably calculated to enable M.G. to receive educational benefits, and in support of their argument, cite evidence that the CSE had determined that M.G. would benefit from "the more intensive placement option provided through SLIP."  Dkt. No. 25-4, p. 9.  It is undisputed that plaintiffs and the CSE believed SLIP would benefit M.G.  The record also shows, however, that SLIP was a more restrictive placement and that the CSE believed M.G. could progress in the less restrictive environment of the elementary school.

The IDEA requires that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  Indeed, the IEP need only provide the "'basic floor of opportunity'" required by the IDEA.  *Grim*, 346 F.3d at 379 (quoting *Rowley*, 458 U.S. at 201).  Thus, the CSE was obligated to recommend the least restrictive environment in which M.G. could make meaningful progress.

In this case, the CSE recommended the elementary school with special education and resource room services, use of the Language! program, and assistance in science and social studies. For the reasons discussed above, *see* IV.B.1.b., the Court finds the preponderance of the evidence supports the SRO's well-reasoned conclusion that the 2004-2005 IEP, which recommended substantially the same placement as the 2003-2004 IEP, was reasonably calculated to enable the M.G. to receive educational benefits. The Court therefore defers to the SRO's conclusion and finds plaintiffs have failed to establish by a preponderance of the evidence that the IEP was inappropriate. Having concluded that the District offered a free appropriate public education for the 2004-2005 school year, the Court need not reach plaintiffs' arguments regarding their unilateral placement of M.G. at Kildonan. Accordingly, defendants' motion for summary judgment on plaintiffs' IDEA cause of action regarding the 2004-2005 school year is granted and plaintiffs' motion for summary judgment on this cause of action is denied.

### C.     Rehabilitation Act/ADA

Plaintiffs assert that the District denied M.G. public transportation to Kildonan for the 2003-2004 and 2004-2005 school years, in violation of the provisions of Rehabilitation Act and the ADA which prohibit discrimination and retaliation. Plaintiffs assert that M.G. was eligible for transportation pursuant to New York State Education Law § 4402, and defendants denied plaintiffs' request for transportation because of M.G.'s disability.

On this issue, defendants submitted an affidavit by Superintendent Gabriel:

Plaintiffs' request for reimbursement of the cost of transporting their child to the Kildonan school was evaluated against the policies adopted by the District in accordance with Section 3635 and Section 4402.4(d) of the Education Law.

Pursuant to the requirements of Section 3635, the District provides free transportation to students attending nonpublic schools located within fifteen miles of their residence.

Such transportation is equally made available to both disabled and nondisabled students alike.  Because the District does not have any students attending Kildonan who live within fifteen miles of that nonpublic school, the District has never transported any student to Kildonan, and has never provided transportation to Kildonan from any centralized pick up point.

Pursuant to Education Law Section 4402.4(d), the District also provides free transportation, up to a distance of fifty miles, to disabled students attending nonpublic schools to the extent the programs and services offered by the nonpublic school are similar to the educational program recommended by the District's [CSE].  In evaluating requests for transportation, the District's CSE will consider and determine whether the services provided by the nonpublic school are similar to those recommended by the CSE.  If so,  reimbursement will be provided.  If not, reimbursement will be denied.

Because Plaintiffs' child resided more than 15 miles from Kildonan,  Plaintiffs were not entitled to transportation reimbursement pursuant to Education law Section 3635.

Plaintiffs' request for transportation reimbursement pursuant to Education Law Section 4402.4(d) was denied solely upon the CSE's determination that the services offered by Kildonan were not similar to the program recommended by the CSE.

Dkt. No. 19-3.  Plaintiffs have submitted no evidence in admissible form disputing Superintendent Gabriel's affidavit.  Moreover, as discussed below, nothing in either administrative record raises a question of material fact requiring trial on the issue of discrimination or retaliation.

### 1.    Discrimination

Claims under the Rehabilitation Act and the ADA proceed under the familiar burden-shifting analysis set forth in *McDonnell Douglas*.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792  (1973); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (applying McDonnell Douglas process to ADA claims); *see also Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002) (claims under the Rehabilitation Act are treated almost identically to those under the ADA).

To prove a violation of the Rehabilitation Act and the ADA, plaintiff must show that: (1) M.G. has a disability; (2) he is otherwise qualified for the benefit that has been denied; and (3) he has been denied the benefit by reason of his disability. *See Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (disability analysis under Section 504). Under the ADA and the Rehabilitation Act, a demand for "reasonable accommodations to assure access to an existing program" is cognizable; but a demand for "additional or different substantive benefits" is not. *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam).

In this case, it is undisputed that M.G. has a disability and that the District denied plaintiffs' request to transport M.G. to and from Kildonan during the 2003-2004 and 2004-2005 school years. Section 3635 of the New York Education Law requires school districts to provide transportation to all students who reside within 15 miles from the private schools they attend. *See* N.Y. EDUC. LAW § 3635. M.G. lived 46 miles from Kildonan, thus § 3635 did not require the District to provide transportation. Section 4402(4)(d) of the New York Education Law, however, requires school districts to provide transportation up to 50 miles to a private school:

> which a child with a handicapping condition attends if such child has been so identified by the local committee on special education and such child attends such school for the purpose of receiving services or programs similar to special educational programs recommended for such child by the local committee on special education.

N.Y. Educ. Law § 4402(4)(d).

The parties' dispute centers on whether Kildonan provides M.G. with "services or programs similar to special educational programs" recommended for him by the CSE. The CSE found Kildonan's services were not "similar" to the special education programs it offered M.G. because Kildonan was more a restrictive placement. Plaintiff argues that Kildonan offered similar programs and therefore asserts that the District's refusal to provide transportation was

68

discriminatory.  Even if the District wrongly interpreted § 4402(4)(d) in denying plaintiffs'

transportation request, plaintiffs have failed to adduce any evidence showing that the District

denied the request because of M.G.'s disability.  Plaintiffs offer no evidence that the CSE,

Superintendent Gabriel, or any other District employee, was motivated by discriminatory animus

toward M.G. or plaintiffs.  Accordingly, defendants are entitled to summary judgment as a matter

of law.

### 2.      Retaliation

In both complaints, plaintiffs allege that "defendant's decision to deprive Plaintiff's son

access to suitable transportation was made in direct retaliation for Plaintiff's move to employ

administrative complaint procedures to challenges services recommended at the public school for

their son."  To establish retaliation under the Rehabilitation Act and ADA, plaintiffs must

demonstrate that: (1) they were engaged in protected activity; (2) the alleged retaliator knew that

they were involved in protected activity; (3) an adverse decision or course of action was taken

against them; and (4) a causal connection exists between the protected activity and the adverse

action."  *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002).

Viewing the facts in the light most favorable to plaintiffs, a reasonable fact finder could

conclude that plaintiffs engaged in protected activities by requesting an administrative hearing on

May 14, 2004 to contest the 2003-2004 IEP, and requesting a second administrative hearing on

June 21, 2005 to contest the 2004-2005 IEP.  There is also evidence that the District was aware of

plaintiffs' hearing requests; indeed, plaintiffs made both requests to Superintendent Gabriel.

Further, it is undisputed that the CSE denied plaintiffs' transportation request for both school

years, thus there is evidence of an adverse action.

Although temporal proximity between the protected activity and the adverse action may be sufficient to establish a causal connection, *see Cifra v. G.E. Co.*, 252 F. 3d 205, 217 (2d Cir. 2001) (the causal connection needed for proof of a retaliation claim "'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)) (balance of citation omitted), in this case, the CSE denied plaintiffs' 2003-2004 transportation request on August 29, 2003, more than eight months *prior* to plaintiffs' commencement of the administrative process on May 14, 2004.  Thus, plaintiffs fail to establish a case of retaliation with respect to the 2003-2004 transportation request.

With regard to the 2004-2005 transportation request, however, plaintiffs have adduced evidence showing that they commenced the administrative process to challenge the 2003-2004 IEP on May 14, 2005, and that, approximately one month later, the District, through the issuance of a letter by Lisa Kreutziger, Clerk of the Board of Education, dated June 21, 2004, denied plaintiffs' request for transportation for the 2004-2005 school year.

Assuming plaintiffs can establish a *prima facie* case of retaliation with regard to their 2004-2005 transportation request, the burden shifts to the defendant who must offer a legitimate non-discriminatory reason for its actions.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Weixel*, 287 F.3d at 148; *Regional Econ. Cmty. Action Program, Inc.*, 294 F.3d at 48-49 (Rehabilitation Act/ ADA retaliation claims are analyzed using the same "burden-shifting" *McDonnell Douglas* framework set forth for Title VII cases).  If the defendant puts forth such a reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable fact finder

to conclude that the reason offered by the defendant is a mere pretext for discrimination.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

In the present case, it is undisputed that defendants have proffered a legitimate, non-discriminatory explanation for the disciplinary action against plaintiffs - that is, a sincere belief that Kildonan program was not similar to the program the District offered because the Kildonan program was more restrictive and did not offer mainstream opportunities.  Even assuming the District interpreted § 4402 incorrectly, plaintiffs offer no evidence that the real reason the CSE refused transportation was in retaliation for plaintiffs' commencement of administrative proceedings.  Because plaintiffs adduce no evidence suggesting that the District's reasons for refusing to provide transportation to Kildonan were a pretext for unlawful retaliation, this claim must be dismissed.

### D.      Section 1983 - Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people equally alike.  *Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001).  To survive a motion for summary judgment, a plaintiff must present evidence both of differential treatment from others similarly situated, and that the treatment was intentional, irrational, and wholly arbitrary.  *Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir. 2001).

Plaintiffs submit no evidence indicating that the District provided another student (disabled or non-disabled) with transportation to a private school, yet denied their request that the District provide M.G. with transportation to Kildonan.  Thus, there is no evidence on which a fact finder could conclude that M.G. received differential treatment from other students with regard to transportation during the 2003-2004 or 2004-2005 school years.  Nor do plaintiffs present

evidence that defendants intentionally, irrationally, or arbitrarily denied their requests for transportation. As discussed, the CSE found Kildonan dissimilar to the special education program recommended in the IEP and therefore concluded that plaintiffs' request did not fall within §4402. Thus, there are no issues of material fact requiring trial and defendants are entitled to summary judgment as a matter of law on this claim.

## V.      CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motions for summary judgment are **DENIED**; and it is further

**ORDERED** that defendants' cross-motions for summary judgment are **GRANTED** in their entirety; and it is further

**ORDERED** that the complaints in this consolidated matter are **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk enter judgment in the lead and member case accordingly.

**IT IS SO ORDERED.**

Date:  September 29, 2009

_____
Norman A. Mordue
Chief United States District Court Judge